Sandra COMPTON, Plaintiff,

v.

ALTAVISTA MOTORS,
INC., Defendant.

No. CIV. A. 6:00CV0015.

United States District Court,
W.D. Virginia,
Lynchburg Division.

Nov. 21, 2000.

Elmer Woodard, Danville, VA, for Plaintiff.

William D. Bayliss, Marissa M. Henderson, Williams, Mullen, Clark & dobbins, P.C., Richmond, VA, for Defendant.

OPINION

MOON, District Judge.

The plaintiff, Sandra Compton, brought this action against the defendant, Altavista Motors, as a result of a used-car deal that she entered into with the defendant in 1999. In her amended complaint, Compton sets forth four different causes of action against Altavista Motors based on the deal. First, Compton claims that Altavista Motors violated the Truth in Lending Act (TILA). Second, Compton asserts that Altavista violated the Virginia Consumer Protection Act (VCPA). Compton's third cause of action alleges that Altavista Motors offended Virginia usury law, and her fourth cause of action claims that Altavista committed federal and Virginia odometer fraud. The parties filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Specifically, Compton moved for summary judgment as to her TILA and VCPA claims, and Altavista Motors filed a cross-motion for summary judgment as to Compton's TILA, usury, and odometer fraud claims. In her response to Altavista's cross-motion for summary judgment, Compton moved for summary judgment in her favor as to the usury claim. For the reasons set forth in this Opinion, the Court will grant in part and deny in part Compton's motion for summary judgment as to the TILA cause of action and will deny Compton's motion for summary judgment as to the VCPA and state-law usury claims. Furthermore, the Court will grant in part and deny in part Altavista's cross-motion for summary judgement on the TILA cause of action, will deny Altavista's motion for summary judgment on the usury claim, and will grant Altavista's motion as to the odometer fraud claims.

## I. FACTS

On February 19, 1999, Sandra Compton visited Altavista Motors and decided to purchase a 1991 Dodge Daytona. Comp-

ton purchased the car in a finance sale, and, during the course of their transaction, Altavista presented Compton with several documents, including a downpayment agreement, buyer's order, credit contract, and total loss protection program form. The downpayment agreement established a $600 downpayment, but stated that Compton would make an immediate payment of $350, leaving a balance of $250 that would be payable in three installments ending March 13. The buyer's order listed the price of the car as $3995, along with a $120 processing fee and $380 for insurance, which added up to the total delivered price of $4495. The credit contract made various TILA disclosures, including the APR, finance charge, and amount financed. The credit contract also indicated that payments would be made in weekly installments beginning on March 21, 1999. The total loss protection program form indicated that the enrollment charge for GAP insurance would be $380 and explained that the insurance was not required in order to finance the vehicle. Altavista disclosed the car's mileage by using an odometer disclosure statement, rather than by indicating the mileage on the title certificate at the time it delivered possession of the vehicle to Compton. After completing this paperwork, Compton drove her newly purchased car off of the lot with temporary license plates ("thirty-day tags") that had been placed on the vehicle by Altavista. Out of this seemingly commonplace scenario arose the multiple causes of action alleged by Compton in her amended complaint.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted if, viewing the record as a whole in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Terry's Floor Fash-*

*ions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.1994) (citations omitted).

## III. DISCUSSION

Compton has asserted four different causes of action against Altavista Motors, often alleging several different theories of liability for a particular claim. The Court will now take up each of Compton's claims separately.

### A. Truth in Lending Act

The Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.* (1994), as implemented by Regulation Z, 12 C.F.R. pt. 226 (2000), was designed by Congress as a tool "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him ... and to protect the consumer against inaccurate and unfair credit billing ... practices." 15 U.S.C. § 1601(a). To that end, the TILA mandates that creditors make specific disclosures when extending credit to consumers. *See* 15 U.S.C § 1638(a); *Gilbert v. Wood Acceptance Co.*, 486 F.2d 627 (7th Cir.1973). These disclosures include the identity of the creditor, the amount financed, the finance charge, and the total number of payments. 15 U.S.C. § 1638(a). Because the TILA is to be broadly construed to provide protection for the consumer, any failure to disclose information as required by the TILA or Regulation Z results in a technical violation. *See Walker v. College Toyota, Inc.*, 399 F.Supp. 778 (W.D.Va.1974), *aff'd* 519 F.2d 447 (4th Cir. 1975); *Riggs v. Government Emp. Financial Corp.*, 623 F.2d 68 (9th Cir.1980).

Altavista Motors is a creditor as defined by 15 U.S.C. § 1602(f). Compton is a consumer as defined by 15 U.S.C.

§ 1602(h). The deal that took place on February 19, 1999, between Compton and Altavista Motors was a credit sale under 15 U.S.C. § 1602(g). *See also* 12 C.F.R. § 226.2(a)(16) (defining "credit sale" as "a sale in which the seller is a creditor"). Compton contends in her amended complaint and motion for summary judgment that the parties engaged in two separate credit transactions, and she sets forth a vast array of liability theories under the TILA's disclosure requirements with regard to each transaction. However, for purposes of establishing liability under the TILA, proving a single violation is just as good as proving one hundred violations. The law is clear in this Circuit that, even though a particular transaction may violate the TILA in numerous ways, a plaintiff is only entitled to one recovery per credit transaction. *See* 15 U.S.C. § 1640(g) (stating that "multiple failure to disclose to any person any information required under this part ... shall entitle the person to a single recovery"); *Carney v. Worthmore Furniture, Inc.*, 561 F.2d 1100, 1103 (4th Cir.1977) (stating, after having affirmed the district court's grant of summary judgment on the plaintiff's first theory of TILA liability, that it was "unnecessary to address the [plaintiff's second theory of liability], as the Act authorizes but one recovery for a given credit transaction regardless of the number of infractions compounded in it"); *see also Jackson v. Columbus Dodge, Inc.*, 676 F.2d 120, 121 (5th Cir.1982) ("A creditor can only be liable for a single recovery even though there are multiple truth-in-lending violations."). For the reasons that follow, the Court holds that Compton is entitled to a recovery under the TILA for disclosure violations committed by Altavista with regard to the credit contract, but not with regard to the deferred downpayment agreement. Thus, the Court will grant and deny both parties' cross-motions for summary judgment as appropriate.

### 1. The Credit Contract

Compton has alleged numerous violations of the TILA concerning the credit contract entered into by the parties as a result of Compton's car purchase. Although the credit contract may have, and probably did, violate the TILA in several different ways, the Court need not address all of the theories set forth by Compton in order to award summary judgment in her favor, for she is allowed only one recovery under the TILA for the transaction embodied by the credit contract. *See Carney,* 561 F.2d at 1103. For the reasons set forth below, the Court finds that Altavista has violated the TILA with regard to the credit contract and, therefore, will grant Compton's motion for summary judgment and deny Altavista's motion on this claim.

■ One of the principal disclosures required by the TILA is the "amount financed." 15 U.S.C. § 1638(a)(2)(A). In disclosing the amount financed, a creditor must either (1) "provide a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," *id.* § 1638(a)(2)(B), or (2) "skip this stage and simply provide the itemization of the amount financed without being asked for it," *Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997) (citing 12 C.F.R. pt. 226, Supp. I § 18(c)). If the creditor provides an itemization, it must contain an accurate disclosure of "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii); *see also Gibson,* 112 F.3d at 285 (emphasizing that the disclosures must be accurate in order to comply with the TILA). However, certain third persons, such as public officials, government agencies, credit reporting agencies, appraisers, and insurance companies, can be identified "using generic or other general terms." 12 C.F.R. § 226.18(c)(1)(iii) n. 41. Lastly, Regulation Z commands that TILA disclosures such as the amount financed must be made "before consummation of the transaction." *Id.* § 226.17(b); *see also* 15

U.S.C. § 1638(b)(1) (stating that "disclosures . . . shall be made before the credit is extended"); *Polk v. Crown Auto, Inc.*, 221 F.3d 691, 692 (4th Cir.2000) (stating that a car dealer was "required to make the disclosures to [the consumer] in writing, in a form that he could keep, before consummation of the transaction"). Consummation of a credit transaction occurs when the buyer signs the credit contract. *See Terry v. Whitlock*, 102 F.Supp.2d 661, 664 (W.D.Va.2000); *see also Moore v. Flagstar Bank*, 6 F.Supp.2d 496, 500 n. 6 (E.D.Va.1997) (defining consummation as "the time that a consumer becomes contractually obligated on a credit transaction" and stating that the plaintiff's "mortgage loan was consummated . . . when the loan papers were signed") (citing 12 C.F.R. § 226.2(a)(13)).

■ Compton has submitted an affidavit, which Altavista does not dispute, stating that she signed various documents in the following order: the downpayment agreement, buyer's order, credit contract, and total loss protection program form. On the credit contract, Altavista made an itemized disclosure of the amount financed, thus triggering the TILA requirement of accurate disclosure of "amounts paid to others." In the blank labeled "Total Other Charges/Amounts Pd. to Others" on the credit contract, Altavista marked "N/A." However, other documents produced during the deal show that Altavista in fact collected $380 from Compton for GAP insurance, at least $215 [1] of which it paid to an insurance company on Compton's behalf. Therefore, the disclosure made by Altavista in its itemization of the amount financed was inaccurate and in violation of the TILA. *See* 15 U.S.C. § 1638(a)(2)(B)(iii).

■ Altavista asserts, based on Compton's affidavit, that Compton signed the above-mentioned documents "contemporaneously." As a result, Altavista contends that Compton had to have been aware of the payments made on her behalf to the insurance company because she signed the total loss protection program form, which listed the $380 premium. However, Altavista's argument must fail for two reasons. First, Compton's affidavit states that she signed the total loss protection program form after she had already signed the credit contract containing the "N/A" disclosure with regard to "amounts paid to others." As explained above, TILA disclosures must be made prior to the consummation of the credit transaction, and the transaction was consummated once Compton signed the credit contract. Second, even if the Court accepts Altavista's argument that it made the "amount paid to others" disclosure on the total loss protection program form, Altavista would still be in violation of the TILA because the disclosure was not accurate in that Altavista neglected to indicate on the form that it was retaining a commission on the GAP premium. *See Jones v. Bill Heard Chevrolet, Inc.*, 212 F.3d 1356, 1361 (11th Cir. 2000) (finding a TILA violation based on inaccurate disclosure of amounts paid to others). Thus, Compton must prevail on this theory of liability under the TILA, and a finding of liability under this theory alone is sufficient to support her one recovery under the Act as to the credit contract. However, for good measure, the Court will also briefly discuss another theory of liability under which Compton must prevail, keeping in mind that her success on this theory does not entitle her to another recovery.

■ The TILA requires that a dealer disclose the finance charge to a credit customer. *See* 15 U.S.C. § 1638(a)(3). The Act defines the finance charge as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the

---

1. The GAP premium submitted to the insurance company on Compton's behalf was $380. A "deal recap" document produced by Altavista, however, indicates that the dealer took a $165 commission on the insurance premium-hence the "as least $215" figure.

extension of credit." *Id.* § 1605(a). However, "[t]he finance charge does not include charges of a type payable in a comparable cash transaction." *Id.* In *Carney v. Worthmore Furniture, Inc.,* the Fourth Circuit held that a seller violated the TILA disclosure provisions by not including a mandatory service policy fee in the finance charge because the seller was unable "to offer documented evidence of a substantial cash business in which identical charges for service policies were levied in each sales transaction." 561 F.2d 1100, 1103 (4th Cir.1977). According to the *Carney* Court, because the service policy "was inextricably intertwined with [seller's] interest as a creditor," it was a finance charge. *Id.; see also Campbell v. General Fin. Corp. of Va.,* 523 F.Supp. 989, 993 (W.D.Va.1981) (stating that the "major question in determining whether a charge is a 'finance charge' required to be disclosed under the Truth–In–Lending Act is whether the seller refuses to extend credit unless the consumer agrees to pay the charge").

It is undisputed that Altavista requires all of its credit customers to have the dealership process the title for them, at a fee of $120. It is also undisputed that Altavista gives its cash customers the option of processing the title themselves or having the dealership do it for them. Because the processing fee is mandatory for credit customers, but not for cash customers, it is a charge "incident to" the extension of credit and, therefore, must be disclosed as part of the finance charge. Like the mandatory service policy in *Carney,* the processing fee that Altavista requires of its credit customers is not "of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). Therefore, because Altavista did not disclose its processing fee as part of the finance charge, it violated the TILA. As a result, the Court will grant Compton's motion for summary judgment as to her TILA claim pertaining to the credit contract and will deny Altavista's cross-motion as to that claim.

### 2. The Downpayment Agreement

■ Compton also contends that Altavista violated the TILA by failing to make the various disclosures required under section 1638 prior to the parties' execution of the downpayment agreement. Altavista does not dispute that it made no TILA disclosures specifically in connection with the downpayment agreement, but contends that such disclosures were not necessary because the agreement represented a deferred downpayment that was not an independent credit transaction subject to TILA disclosure rules. Because the Court agrees that separate disclosures were not necessary, Compton's motion for summary judgment will be denied and Altavista's cross-motion for summary judgment will be granted on this claim.

The TILA requires that creditors make certain disclosures before engaging in a "consumer credit transaction." 15 U.S.C. § 1638. One item that a creditor must disclose is the "amount financed," and the amount financed is determined in part by subtracting the downpayment from the cash price of the purchase. *See id.* § 1638(a)(2)(A)(i). By their nature, most credit transactions involve the making of a downpayment, and oftentimes the consumer will not make the entire downpayment initially, but instead will make a partial payment when the deal is consummated and then pay off the balance of the downpayment at a later date. This type of arrangement is called a deferred downpayment or "pick-up payment" and is addressed by the regulations interpreting the TILA. According to Regulation Z, "[a] deferred portion of a downpayment may be treated as part of the downpayment if it is payable not later than the due date of the second otherwise regularly scheduled payment and is not subject to a finance charge." 12 C.F.R. § 226.2(a)(18).

Under the Official Staff Interpretations of Regulation Z, "[a] deferred downpayment that meets the criteria set forth in the definition may be treated as part of the

downpayment, at the creditor's option." *Id.* pt. 226, Supp. I § 226.18(b)(1). If the creditor chooses to include the pickup payment in the downpayment, then it is included in the amount subtracted from the cash price when calculating the amount financed. *See id.* pt. 226, Supp. I § 226.2(a)(18). Furthermore, the pick-up payment need not be included in the payment schedule that must be disclosed as part of the amount financed under section 226.18(g). *See id.* Only if the creditor chooses not to include the pick-up payment as part of the downpayment, or is unable to do so because the payment does not meet the requirements of the statute, must the pick-up payment be included separately in the amount financed. *See id.; see also id.* pt. 226, Supp. I § 226.18(b)(1) (stating that pick-up payments "that are treated as part of the downpayment are not part of the amount financed").

A reading of the TILA and Regulation Z provisions that discuss deferred downpayments leads to the conclusion that pick-up payments are simply a component of the underlying credit transaction that might need to be disclosed as such. Nowhere in the Act or its regulations .is it stated or implied that deferred downpayments are separate credit transactions for which the entire slew of TILA disclosures must be made, and Compton has not pointed to any case law to the contrary.[2] Furthermore, this reading is consistent with the purpose of the TILA to "assure a meaningful dis-

closure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him," for it would be useless to disclose such an item as the finance charge in the case of an interest-free pick-up payment because the figure would be "zero." 15 U.S.C. § 1601(a); *see also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) ("Meaningful disclosure does not mean more disclosure. Rather, it describes a balance between 'competing considerations of complete disclosure ... and the need to avoid ... [informational overload].' "). Thus, Altavista did not need to make separate TILA disclosures with regard to the downpayment agreement, but instead had to comply with the procedures under Regulation Z for dealing with the deferred downpayment.

The $250 pick-up payment in this case meets the criteria for treatment as part of the downpayment under section 226.2(a)(18) of Regulation Z because there was no finance charge and because the balance of the downpayment was payable prior to the due date of the second payment under the credit contract. Thus, Altavista acted in conformity with Regulation Z by including the pickup payment within the $600 downpayment figure and by excluding the pick-up payment from its amount financed disclosures on the credit contract. Therefore, because Altavista

---

**2.** Compton claims that the Seventh Circuit case of *Gilbert v. Wood Acceptance Co.,* 486 F.2d 627 (7th Cir.1973), supports her position that separate TILA disclosures must be made for a deferred downpayment, and she also points out that this Court has cited *Gilbert* with approval. However, Compton is misguided in her interpretation of the *Gilbert* case and of this Court's citation of it. The issue in *Gilbert,* a case decided before the revision of the TILA and Regulation Z, was whether deferred downpayments "should be stated separately in that part of the [consumer credit] contract which breaks down the downpayment figure," and not whether deferred downpayments constitute separate credit transactions for which independent TILA disclosures are required. *Gilbert,* 486 F.2d at

632. Thus, the language upon which Compton relies-namely that "the Act, which, with a few exceptions, applies to the entire genus 'consumer credit transactions,' regulates disclosures for the 'deferred downpayment' type of transaction"-merely refers to the *Gilbert* Court's conclusion that the deferred portion of the downpayment should be listed separately from the initial cash downpayment in the disclosures made in connection with the retail installment sales contract. *Gilbert,* 486 F.2d at 631. Lastly, the Court notes that it has cited *Gilbert* not for the proposition set forth by Compton, but instead for the general idea that the TILA requires that disclosures accompany the extension of credit. *See* Section III.A., *supra; see also Polk v. Crown Auto, Inc.,* 110 F.Supp.2d 455, 457 (W.D.Va.1999).

complied with the TILA and Regulation Z with regard to the deferred downpayment, Compton's motion for summary judgment on this claim will be denied and Altavista's motion will be granted.

### B. Virginia Consumer Protection Act

■ The Virginia Consumer Protection Act (VCPA) broadly prohibits the use of "any ... deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1–200(14) (Michie 1998 Supp.). The VCPA also provides a private right of action to "[a]ny person who suffers loss as the result of a violation." *Id.* § 59.1–204. Compton's first theory of liability under the VCPA is that Altavista Motors committed consumer fraud in connection with its issuance of her thirty-day tags. Under Virginia law, if a dealer transfers a vehicle that is to be registered in Virginia, then the dealer must "submit to the [DMV] a written application for the current titling and registration of the purchased vehicle, accompanied by the prescribed fees," *id.* § 46.2–1561, and failure by the dealer to do so can lead to criminal liability, *see id.* § 46.2–1565.1 (stating that a violation of the thirty-day tag provisions is a "Class 3 misdemeanor"). A dealer also must include on the buyer's order "[t]he amount of any sales and use tax, title fee, uninsured motor vehicle fee, registration fee, or other fee required by law for which the buyer is responsible and the dealer has collected." *Id.* § 42.2–1530(8).

The downpayment agreement entered into between Compton and Altavista shows that Compton was required to pay $159.95 in DMV fees, and Compton has put forth evidence, undisputed by Altavista, that she did in fact pay the fees. However, the buyer's order for the transaction does not list the DMV fees. Compton contends

that, because Altavista was required to collect the titling and registration fees, the fees must be disclosed on the buyer's order; furthermore, because Altavista did not separately list the fees on the buyer's order, they must be included in $3995 price stated on the buyer's order form. Compton then reasons that, because Altavista must necessarily have collected the DMV fees and included them in the price reflected on the buyer's order, its requirement in the downpayment agreement that she pay the DMV fees was an attempt to "jack up" the purchase price of the car, a practice that would qualify as deceptive for purposes of establishing liability under the VCPA. However, instead of setting forth any actual evidence that Altavista jacked up the price of the car, Compton simply makes the assumption that it must be so because Altavista was required to have collected the fees when it issued Compton her thirty-day tags in order to avoid being liable for a misdemeanor under Virginia's motor vehicle laws. Of course, this assumption, premised on mere speculation and conjecture, is not evidence sufficient to allow for summary judgment for Compton on the claim that Altavista committed a deceptive practice, for a reasonable juror could certainly find, based on the current evidence, that Altavista did not "jack up" the purchase price by double-charging for the DMV fees.[3]

Compton's second theory of liability in support of her motion for summary judgment on her claim under the VCPA is that Altavista acted deceptively by requiring her to pay $94.91 for liability insurance, even though she was not yet the legal owner of the car because the dealer had not yet signed over the title. In addition, Compton contends that Altavista's requirement that she purchase the liability insur-

---

3. Compton asserts that, if Altavista disputes (as it does) the argument that it previously collected the DMV fees, then it is admitting that it committed crimes under the Virginia motor vehicle laws, thereby making the contract void. The Court need not address the issue of whether the contract would be void because it is irrelevant to the present matter of whether a genuine issue of fact exists concerning Altavista's engagement in deceptive practices under the VCPA.

ance was deceptive because the dealer had previously stated in the downpayment agreement that it would continue to insure the vehicle until the balance of the pick-up payment had been paid. The only evidence set forth by either party thus far with regard to this second theory of VCPA liability is the downpayment agreement and Compton's own affidavit. The downpayment agreement does indeed state that Altavista agreed to maintain insurance on the vehicle until Compton had paid the downpayment in full. However, on the issue of whether Altavista *required* her to pay for the additional liability insurance, Compton's affidavit merely states the following:

> I then told .Mr. Seeney [an Altavista employee] that I had to arrange liability insurance through my preferred agent, Gray and Smith in Altavista. Seeney said that he had already taken care of it with Nationwide, as that was where Altavista Motors insured all of its cars, and that I could pay Seeney for the insurance provided by Chip Roark. I paid Seeney $94.91.

While it may be the case that Compton, after submitting further evidence at trial, will be able to show that Altavista committed consumer fraud in connection with her purchase of the liability insurance, if the available evidence is viewed in the light most favorable to Altavista, a reasonable jury could conclude that there was no deceptive practice. The current record is simply too sparse to support an award of summary judgment, and, therefore, Compton's motion will be denied as to her VCPA claim. *Cf. Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.1951) (stating that "[i]t is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper" and that "[e]ven in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgement. . . .)."

### C.  Usury

Compton's usury claim is based on the argument that the GAP insurance, as well as the liability insurance, were unlawful additional finance charges under section 6.1–330.77 of the Code of Virginia because they were not voluntarily purchased. Because a genuine issue of material fact exists concerning the voluntariness of Compton's insurance purchases, summary judgment is not proper, and the cross-motions of both parties on will be denied as to the usury claim.

### D.  Odometer Fraud

Altavista Motors has moved for summary judgment with regard to Compton's claims under the federal and Virginia odometer acts. For the following reasons, the Court will grant Altavista's motion.

### 1.  Federal Odometer Act

The federal Odometer Act sets forth various disclosure requirements that a car dealer must meet when it transfers a vehicle. The statute requires that the transferor of a vehicle provide the transferee with a written disclosure either "of the cumulative mileage registered by the odometer," or "that the mileage is unknown if the transferor knows that the mileage registered by the odometer is incorrect." 49 U.S.C. § 32705(a)(1) (1994). The statute also states that a transferred vehicle may not be licensed in a state unless the transferee submits the transferor's title, which must contain a signed-and-dated mileage disclosure made by the transferor, along with her application for a new title. *See id.* § 32705(b). Furthermore, according to the regulations construing the Act, "[i]n connection with the transfer of ownership of a motor vehicle, each transferor shall disclose the mileage to the transferee in writing on the title." 49 C.F.R. § 580.5 (1999).

■ It is undisputed that on February 19, 1999, Altavista issued Compton an odometer disclosure form containing a statement of the mileage on the odometer of the car that she was purchasing. Compton does not assert that the mileage disclosed by Altavista was inaccurate; rather, she claims that Altavista violated the Odometer Act by using the odometer disclosure statement to indicate the mileage on the title, instead of placing the mileage disclosure on the title itself. Furthermore, Compton contends that Virginia law requires that the mileage disclosure be made on the title at the time the vehicle is delivered to the purchaser. *See* Va.Code Ann. §§ 46.2–628, 46.2–629. Altavista Motors, however, argues that a transferor can comply with the Act's requirement that the mileage be disclosed on the title "in connection with" the transfer of the vehicle, *see* 49 C.F.R. § 580.5, as long as the notation on the title is made "somewhere in the course of the process of transferring title." According to Altavista, "[d]isclosure on the title is not required before or at the same time as the first creation of a purchaser's title interest in the vehicle." Although Altavista's arguments that it complied with the Act might be correct, the Court need not decide the issue because Compton has not met her burden for establishing civil liability against Altavista.

The federal Odometer Act allows a private person to bring a civil action for "3 times the actual damages or $1,500, whichever is greater," against a person who has violated the Act "with intent to defraud."

49 U.S.C. § 32710. As discussed above, Altavista might have violated the Odometer Act by disclosing the car's mileage on the odometer disclosure statement rather than on the title at the time of the transaction. Nevertheless, even if Compton can show that an Odometer Act violation occurred, she cannot avoid summary judgment unless she can provide evidence sufficient to show that Altavista committed the violation with an intent to defraud. Unlike nearly all of the reported cases that have discussed the Odometer Act's "intent to defraud" requirement, Compton's argument that Altavista violated the Act with an intent to defraud does not pertain to the accuracy of the odometer reading .disclosed by the dealer. Indeed, Compton does not contest the fact that Altavista correctly disclosed the odometer mileage for the car, both on the buyer's order and on the odometer disclosure statement. Instead, Compton sets forth the novel argument that, if she can establish that Altavista acted with an intent to defraud concerning the Act's requirement that mileage be disclosed on the title itself, then she can meet the test for claiming civil liability.

Under her theory, Compton attempts to establish an intent to defraud in part by alleging that Altavista had either actual or constructive knowledge that it was violating the Odometer Act by using the odometer disclosure statement in lieu of making the mileage disclosure on the title itself.[4] For this argument, Compton draws upon the "actual or constructive knowledge"

4. Compton also makes a broader argument that Altavista violated the on-the-title disclosure provision of the Act as part of a larger scheme to defraud its customers into believing that they owned the vehicles that they purchased immediately following the consummation of the deal, whereas the customers were not actually the true owners until they received the certificate of title. Compton contends that Altavista uses the odometer disclosure statement in order to avoid having to issue the title at the time that it delivers possession of the vehicle to the purchaser. Although Compton's theory may show "intent to defraud" in a general sense, because that

intent does not have anything to do with fraud involving mileage accuracy, it does not meet the test for establishing civil liability under the Act. *See* Section III.D.1, *infra*. To interpret the "intent to defraud" provision as Compton does could lead to the federalization of a "large segment of common law fraud," which is certainly not consistent with the stated purposes of the Odometer Act. *Michael v. Ferris Auto Sales*, 650 F.Supp. 975, 977 (D.Del.1987) (stating that "Congress intended the federal odometer statute to apply only in cases of actual odometer tampering or non-disclosure to purchasers of vehicles with altered or reset odometers").

standard for "intent to defraud" set forth in cases dealing with inaccurate mileage disclosures. *See, e.g., Nieto v. Pence,* 578 F.2d 640, 642 (5th Cir.1978) (holding that the term "intent to defraud" encompasses situations in which "a transferor reasonably should have known that a vehicle's odometer reading was incorrect."); *Aldridge v. Billips,* 656 F.Supp. 975, 978 (W.D.Va.1987) (stating that an "intent to defraud" can be found "when the transferor 'recklessly disregarded' obvious indications that a mileage disclosure was false"). However, to the knowledge of this Court, no reported case has ever found an intent to defraud based on constructive knowledge of an Odometer Act violation not related to the accuracy of the mileage statement. The only published opinion with language even potentially supportive of Compton's theory, *Leslie v. George Thompson Ford, Inc.,* 484 F.Supp. 954, 957–58 (N.D.Ga.1979), merely stated in dicta that, "[e]ven if the standard is constructive knowledge of [a non-mileage related violation of the Act]," the plaintiff could not establish an intent to defraud. *Leslie* is far from a clear endorsement of Compton's theory that a consumer plaintiff can establish the requisite intent to defraud under the Act by pointing to actual or constructive knowledge of violations unrelated to accurate mileage disclosure.

The only purposes of the Odometer Act that Congress chose to articulate in the statute's "findings and purposes" section are "(1) to prohibit tampering with motor vehicle odometers; and (2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701. Nevertheless, Compton argues that the amendments made to the Odometer Act in 1986, in which Congress included the requirement that the mileage be placed on the title itself, established the on-the-title disclosure requirement as another "central purpose" of the Act. Compton's argument fails, however, because the on-the-title disclosure requirement is simply a means of fulfilling the Act's previously articulated

purposes, which no doubt accounts for the fact that the "findings and purposes" section of the Act was not amended to reflect the addition of on-the-title disclosure requirement. The requirement that mileage disclosure be made on the title document itself is just another "safeguard" to protect purchasers from buying cars with altered or reset odometers. Thus, because Compton has set forth no evidence that Altavista's alleged violation of the Act's on-the-title disclosure requirement was in any way motivated by an intent to defraud her with regard to the accuracy of the mileage of her automobile, the Court will grant Altavista's motion for summary judgment on Compton's federal Odometer Act claim.

### 2. Virginia Odometer Disclosure Statute

Section 46.2–1532 of the Code of Virginia states that all motor vehicle dealers "shall comply with all requirements of the Federal Odometer Act" and Virginia odometer law "by completing the appropriate odometer mileage statement form for each vehicle purchased, sold or transferred, or in any other way acquired or disposed of." Section 46.2–1532 goes on to state that a "person found guilty of violating any of the provisions of this section shall be guilty of a Class 1 misdemeanor." The Virginia odometer disclosure statute is a criminal law that does not contain a civil component. Furthermore, there is no Virginia case law that has inferred a private right of action from the statute. Therefore, because Compton cannot recover as a matter of law under Section 46.2–1532, the Court will grant Altavista's motion for summary judgment as to Compton's claims under the Virginia odometer disclosure statute.

### IV. CONCLUSION

For the reasons set forth in this Opinion, the Court will grant in part and deny in part Compton's motion for summary judgment as to the TILA cause of action and will deny Compton's motion for sum-

mary judgment as to her VCPA and state-law usury claims. Furthermore, the Court will grant in part and deny in part Altavista's cross-motion for summary judgement on the TILA claims, will deny Altavista's motion for summary judgment on the usury claim, and will grant Altavista's motion as to the odometer fraud claims.

The Clerk of the Court is hereby instructed to send a certified copy of this Opinion and the accompanying Order to all counsel of record.

### ORDER

On July 26, 2000, the plaintiff, Sandra Compton, filed an amended complaint in this Court setting forth four separate causes of action against the defendant, Altavista Motors. Both the plaintiff and the defendant filed cross-motions for summary judgment as to the various claims. For the reasons set forth in the attached Opinion, the plaintiff's motion for summary judgment as to her first cause of action (TILA) shall be, and hereby is, GRANTED in part and DENIED in part. In addition, the plaintiff's motion and cross-motion for summary judgment as to her second and third causes of action (VCPA and Usury) shall be, and hereby are, DENIED. Furthermore, the defendant's cross-motion for summary judgement as to the plaintiff's first cause of action (TILA) shall be, and hereby is, DENIED in part and GRANTED in part. The defendant's motion for summary judgment on the plaintiff's third cause of action (Usury) shall be, and hereby is, DENIED. The defendant's motion for summary judgment as to the plaintiff's fourth cause of action (Odometer Fraud) shall be, and hereby is, GRANTED.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Order and the attached Opinion to all counsel of record.