Beatrice HODGES, Plaintiff,

v.

KOONS BUICK PONTIAC GMC, INC., et al. Defendants.

No. 00CV793A.

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 3, 2001.

Thomas Bryan Christiano, Blankingship & Koomey PC, Alexandria, VA, for Beatrice Hodges.

Jack David Lapidus, MacLeay, Lynch, Gregg & Lynch PC, Washington, DC, for Koons Buick Pontiac GMC, Inc.

Daniel S. Fiore, Law Office of Daniel S. Fiore, Arlington, VA, for First Union Nat. Bank.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court is the defendants' Motion for Summary Judgment on all counts of the plaintiff's ten count complaint.[1] For the reasons set forth below, this motion will be GRANTED.

## BACKGROUND

Plaintiff Beatrice Hodges filed this action against defendants Koons Buick Pontiac GMC, Inc. ("Koons") and First Union National Bank (FUNB) on May 12, 2000 raising federal and state law claims arising from Koon's sale in May, 1998 of a Pontiac Grand Am to Hodges and from the defendants' financing of this sale. Plaintiff's causes of action include violations of the Federal Truth in Lending Act (Counts I, II, and IX), the Virginia Consumer Protection Act (Counts III, "first" IV, "second" IV, and V), breach of contract (Counts VI and VII), and common-law fraud (Count VIII).

The factual record suffers from three infirmities. First, defendant Koons' principal salesman involved in this transaction passed away during the two years since the sale. Consequently, the record lacks any deposition testimony presenting the dealership's perspective on the sale.

Second, the sole plaintiff, Hodges, participated in this sale as a "paper purchaser" to enable her sister, Ruth Morris, to acquire an automobile. At the time, Morris was in the midst of bankruptcy proceedings and her car had just been repossessed. Although Hodges remains the titled owner of the car, she testified that she has never been and never intended to be the individual driving, possessing, maintaining, insuring, or paying for the car. (Hodges. Dep. at 22–25). Her deposition testimony repeatedly confirms that she played no active role "at all" in negotiating the car sale.[2] Instead, she

---

1. The complaint erroneously includes two Count IV's. Thus, although the counts are numbered as claims I through IX, there are actually ten claims in this lawsuit. For purposes of this Opinion, we shall refer to the claims as numbered in the Complaint and distinguish between the two claims numbered Count IV simply as the "first" and "second" Count IV.

2. Hodges testified that she did not participate in the negotiations "at all" and was "not really paying attention" (Hodges. Dep. at 43). Hodges did not know why Morris selected the Grand–Am because she "wasn't in on

their conversation." (*Id.* at 58). The salesmen "did all the business talking with her [Morris]." (*Id.* at 71). At times she left the room (*Id.* at 48–49). She participated only in "the signing." (*Id.* at 38.)

Q. When you signed the documents, did you go over the documents with the salesperson?

A. No I didn't, I signed-I let Ruth look at the document first before I signed it, and then I would sign. If she said it was okay. (*Id.* at 59).

Hodges testified to having no recollection of whether or not the price and fee figures were filled in on the documents she signed. (*Id.* at

signed sale and finance documents at her sister's direction without reading or questioning them. Because Hodges did not actively participate in the sale, her deposition testimony reveals only incidental firsthand knowledge of the terms and circumstances of the sale.

Third, the record contains several redundant and contradictory documents which are all signed by the plaintiff and all dated May 16, 1998. The record includes two Retail Installment Sale Contracts (RISC's) covering Hodges' purchase of the Grand–Am from Koons. The first RISC.[3] (Compl., Ex. B) (hereinafter, the "Primus RISC") appears typewritten on the preprinted form of Primus, Inc.; the second RISC (Compl., Ex. C) (hereinafter, the "First Union RISC") appears on the preprinted form of First Union National Bank. The parties do not dispute that no funding was ever advanced under the Primus RISC.[4]

It is undisputed that Hodges accompanied her sister Ruth Morris to Koons' dealership on Saturday, May 16, 1998.

They completed an initial round of paperwork, apparently including the Primus RISC, during the May 16 visit. The Primus RISC was not funded. After being advised of the rejection of the Primus RISC, the plaintiff and her sister returned at some point between Monday, May 18 and Wednesday, May 20.

During the course of these visits, Morris engaged in negotiations with Koons personnel which resulted in the selection of a specific Pontiac Grand Am for purchase under Hodges' name. Hodges played no active role in these discussions, and simply signed documents at Morris' instruction. However, both Hodges and Morris understood that the Grand Am in question was a "dealer demonstration" vehicle which had been used by dealership employees, but had never been sold or titled to a separate owner. Both plaintiff and her sister recall Koons personnel explaining that the car was considered "new" because it had never been titled before.

During their second visit, the pair completed the First Union RISC. The terms of

---

70). Likewise, she was unsure of the date on which documents were signed, whether specific figures appeared on the form when she signed, and even if the forms were blank or not. (*Id.* at 77–84).

3. The Primus RISC recites a cash price including $908.65 in sales tax of $18,719.00. (This corresponds to the addition of the $908.65 sales tax, the $17,774 base price, and $399.00 for installation of a "silencer" system as reflected on Buyer's Order A.) The Primus RISC adds a $2000 manufacturer's rebate and a $750 cash down payment to reach a total down payment of $2750, which in turn yields an unpaid balance of $15,969.00. Under the heading of amounts to be paid to others on the buyer's behalf (with the proviso that the dealership may retain some of these funds), the Primus RISC identifies $107.00 in license, title, and registration fees and $289.00 for "filing fees." The Primus RISC also indicates $406.32 in premiums for credit life insurance, and an additional $399.00 for a Security System. These charges amount to

an additional $1,201.32, which when added to the unpaid cash price yield a total amount financed of $17,170.32. Based on the amount financed and an annual percentage rate of 13.5%, the Primus RISC calculates a total finance charge of $6,534.48, total payments of $23,704.80, and a total sale price (adding the down payment) of $26,454.80. The payment obligations are described as 59 monthly payments and one final payment of $395.08 starting June 15, 1998.

4. The record also includes two Buyer's Orders on Koons' preprinted Buyer's Order forms. Deposition testimony suggests that the second of these two Buyer's Orders, which indicates a $700 reduction in sale price, may have been filled out in response to Morris' complaints about the car. Our decision with respect to the fraud claims obviates any further examination of this issue, except for noting that its resolution either way would not impact our findings with respect to all claims arising from the financing of the sale pursuant to the First Union RISC.

the First Union RISC are consistently more favorable to the purchaser than the Primus RISC. For example, the First Union RISC begins with a cash price including taxes, accessories, and extras of $18,268.95, substantially lower than the $18,719.00 disclosed on the Primus RISC. Minus the same $2,750 down payment, the unpaid balance was $15,518.95 rather than $15,969.00. Like the Primus RISC, the First Union RISC discloses $107.00 in license, title, and registration fees. An entry for $289.00 appears as a processing fee payable to Koons, rather than the "filing fee" listed on the Primus RISC as payable to public officials. The First Union RISC added a $34.80 business license tax, and $386.59 in premiums for credit life insurance. These additional charges total $817.39, which when added to the unpaid balance produce a total amount financed of $16,336.34 rather than $17,170.32. Based on the amount financed and an annual percentage rate of 13.5%, the First Union RISC calculated a total finance charge of $6,217.06, total payments of $22,553.40, and a total sale price (adding the down payment) of $25,303.40. The payment obligations are described as 60 monthly payments of $375.89 starting June 15, 1998.

It is undisputed that the First Union RISC was ultimately approved, that funding was advanced under the First Union RISC, and that Koons relinquished possession and title of the automobile. According to Morris' deposition testimony, she took delivery of the Grand Am on May 25, 1998; Koons has produced no contrary evidence. (Hodges. Dep. at 51).

Since the car left Koons' dealership Morris has used the car to commute to and from downtown Washington D.C., where she works as a secretary at the House of Representatives, and otherwise treated the car as her own. During the two years she possessed it, Morris had four accidents in the car. She spent the insurance proceeds from each of these incidents on other expenditures rather than repairing the car. She experienced difficulties with the car in early 2000, and stopped making payments in June. Plaintiff Hodges filed this action on May 12, 2000, nearly two years after purchasing the car.[5]

### DISCUSSION

Summary judgment should be granted if, viewing the record as a whole in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986); *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.,* 763 F.2d 604, 610 (4th Cir.1985). In considering a motion for summary judgment, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the non-moving party." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citations omitted).

### A. Truth in Lending Act Claims(TILA)

Counts I, II, and IX allege violations of the Truth in Lending Act ("TILA") (Title I of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601 *et seq.*), as implemented by Federal Reserve Board Regulation Z, 12 C.F.R. § 226. TILA mandates that creditors make specific disclosures when extending credit to consumers, including the

---

**5.** As a consequence of an earlier ruling which denied defendants leave to amend their answer to raise new affirmative defenses near the close of discovery, defendants are unable to raise statute of limitations arguments which might otherwise defeat several of the plaintiff's causes of action. Specifically, defendants have been restrained from raising the one year statute of limitations for Truth in Lending claims prescribed by 15 U.S.C. § 1640(e).

identity of the creditor, the amount financed, the finance charge, and the total number of payments. *See* 15 U.S.C. § 1638(a).

Count I alleges that Koons' preparation and submission of the Primus RISC violated TILA. Specifically, plaintiff challenges the listing of a $289.00 processing fee as a "filing fee" payable to public officials.

 Under 15 U.S.C. § 1640, "any creditor who fails to comply with any requirement imposed under [TILA] with respect to any person is liable to such person" for the sum of "any actual damage sustained by such person as a result of the failure" under § 1640(a)(1) and statutory damages as defined by § 1640(a)(2). Stat-utory damages are only available for failure to comply with a few of the specific disclosure requirements of § 1638(a).[6]

 Koons responds, first, that claims arising from any errors in the Primus RISC are moot because that RISC was not funded and not utilized in the car sale. Koons points out that the First Union RISC, which was actually used to obtain financing, properly lists the $289.00 processing fee as payable to the dealership. Even if the Primus RISC were construed to violate TILA, subsequent financing of the sale through a RISC correctly disclosing the fee would operate as a "correction" of the error. Because 15 U.S.C. § 1640(b)[7] provides a safe harbor for er-

---

**6.** We note that even if the plaintiff were to recover on any of these theories of TILA liability, her maximum recovery would be a single statutory damages award of $1,000. TILA allows recovery for "actual damages" under § 1640(a)(1) and statutory damages as defined by § 1640(a)(2).

TILA entitles plaintiffs to one recovery under § 1640 per credit transaction, regardless of the number of specific TILA violations involved. *See* 15 U.S.C. § 1640(g). *See also Compton v. Altavista Motors,* 2000 WL 1744915 (W.D.Va.2000), *quoting Carney v. Worthmore Furniture, Inc.,* 561 F.2d 1100, 1103 (4th Cir.1977).

To recover actual damages, the plaintiff must show a real loss or injury proximately caused by the defendant's TILA violation. *See Cirone–Shadow v. Union Nissan of Waukegan,* 955 F.Supp. 938, 943 (N.D.Ill.1997). "In order to show causation, a plaintiff must show that: (1) he read the TILA disclosure statement; (2) he understood the charges being disclosed; (3) had the disclosure statement been accurate, he would have sought a lower price; and (4) he would have obtained a lower price." *Peters v. Jim Lupient Oldsmobile Co.,* 220 F.3d 915, 916 (8th Cir.2000). Having abdicated all involvement in selecting the car to Morris, Hodges cannot plausibly argue that she would have sought or obtained a lower price had any of the challenged disclosures been accurate.

Statutory damages under § 1640(a)(2)(A)(i) are capped at $1,000 per credit transaction. *See Mars v. Spartanburg Chrysler Plymouth,*

*Inc.,* 713 F.2d 65 (4th Cir.1983). *See also Ka A. Lee v. Koons Buick, Pontiac, GMC,* CA No. 98–1370–A, n. 3. (E.D.Va.1999) (unpublished) (Bryan, J.); *Strange v. Monogram Credit Card Bank of Georgia,* 129 F.3d 943 (7th Cir.1997).

Thus, even if Hodges were to prevail on all theories under counts I, II, and IX, her maximum recovery under TILA would remain $1,000.

**7.** Section 1640(b), captioned "correction of errors," provides:

A creditor or assignee has no liability under this section or section 1607 of this title or section 1611 of this title for any failure to comply with any requirement imposed under this part or part E of this subchapter, if within sixty days after discovering an error, whether pursuant to a final written examination report or notice issued under section 1607(e)(1) of this title or through the creditor's or assignee's own procedures, and prior to the institution of an action under this section or the receipt of written notice of the error from the obligor, the creditor or assignee notifies the person concerned of the error and makes whatever adjustments in the appropriate account are necessary to assure that the person will not be required to pay an amount in excess of the charge actually disclosed, or the dollar equivalent of the annual percentage rate actually disclosed, whichever is lower.

rors corrected within 60 days, Koons argues that it is not liable. Plaintiff's pleadings do not respond to these arguments, which we find to be correct. Any errors in the Primus RISC are simply irrelevant to the defendants' liability and were timely corrected. Therefore, summary judgment in defendants' favor on Count I is warranted.

■ Count II attacks the financing of the sale under the First Union RISC for violating TILA in four respects. First, plaintiff alleges, on information and belief, that Koons failed to properly disclose a discount in its financing arrangements with FUNB. (Compl.¶¶ 33–35). Plaintiff has produced no evidence to substantiate this claim. In opposing summary judgment, plaintiff concedes that she has no evidence of a discount but argues for the first time that the finance documents acquired in discovery reveal an undisclosed "insurance reserve," which she tries to argue is evidence of a discount. We agree with Koons that it is too late in these proceedings to raise a totally new claim, and summary judgment is in order with respect to this argument.

■ Count II also alleges that the First Union RISC inappropriately lists the $289.00 processing fee as part of the amount financed rather than as a finance charge, thereby violating TILA. (Compl.¶ 36). Koons responds that the processing fee is not a finance charge and was properly listed on the First Union RISC. Koons explains that it charges a $289.00 dealership processing fee on all sales, whether for cash or for credit. Plaintiff has produced no evidence to contradict Koons' claim. Under TILA, a "finance charge" includes any charges "imposed by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction." 15 U.S.C. § 1605(a). Because Koons levies the $289.00 processing fee on every car sale, whether for cash or credit, the fee is not a "finance charge" as defined by 15 U.S.C. § 1605(a) and 12 CFR § 226.4(a). *See also Alston v. Crown Auto*, 224 F.3d 332, 334 (4th Cir.2000) (a dealer did not violate TILA when it failed to designate as a "finance charge" an $85.00 fee payable in a comparable cash transaction). Accordingly, summary judgment in defendant's favor is warranted with respect to this theory of recovery.

■ Third, Count II alleges that "Koons fraudulently backdated the retail installment sale contract to May 16, 1998. When backdating the second Note, Koons increased the cost of credit to the Plaintiff and fraudulently altered the terms of the first Note." (Compl.¶ 37). This theory of recovery is problematic in several respects. First, Hodges and Morris acknowledged in deposition that they understood that the finance documents were backdated when Hodges signed. Morris recalled that "there was no secret" that she knew that "every one of the documents was dated 5/16." (Morris. Dep. at 151), defeating the asserted "fraudulency" of the backdating. Second, this paragraph implies that the First Union RISC "fraudulently" altered the Primus RISC to plaintiff's detriment; however, the terms of the First Union RISC are uniformly more favorable to the plaintiff than the Primus RISC. More importantly, the plaintiff never satisfactorily articulates the way in which alleged backdating renders the First Union RISC's TILA disclosures inaccurate. The First Union RISC describes a payment schedule commencing June 15, 1998 regardless of the date on which the RISC is signed or funds disbursed. Plaintiff's counsel admitted in oral argument that the disclosed figures for the total payments, total finance charges, and total amount financed would remain accurate so long as

all payments were made in a timely fashion. Obviously, late payments trigger the interest-driven penalties which throw off these disclosures in any case. Plaintiff maintains, however, that late penalties under the backdated RISC would be greater due to a longer interest accumulation than penalties under a RISC dated later. However, on the facts of this case and in light of the recognition and acquiescence of Hodges and Morris to backdating the documents, we find that summary judgment in defendant's favor is in order.

■ Finally, plaintiff alleges that Koons' TILA disclosures regarding the First Union RISC were made "after the consummation of the sale," thereby depriving Hodges of a meaningful opportunity to "shop" for a better interest rate. We note Hodges' deposition testimony that, at the time that the First Union RISC was signed (the earliest time at which Hodges might have become obligated under the RISC), she simply signed documents at her sister's direction and that Morris kept all the paperwork from the transaction. (Hodges Dep. at 81). If, as plaintiff maintains, Morris did not take delivery of the vehicle until after the RISC was signed, then the TILA disclosures provided at this time certainly satisfied the timing requirements of *Polk v. Crown Auto*, 221 F.3d 691 (4th Cir.2000). Accordingly, we will grant summary judgment on Count II.

Count IX (actually the tenth count) is the only count directed at defendant FUNB. Because any liability on this count stems from alleged defects in the First Union RISC and we have determined that the First Union RISC did not violate TILA, summary judgment on Count IX is appropriate.

B. Virginia Consumer Protection Act Claims

■ Count III, the two Count IV's, and Count V allege violations of the Virginia Consumer Protection Act, Va.Code § 59.1–200. As a threshold matter, the VCPA exempts from coverage any aspect of a consumer transaction governed by TILA. *See* Va.Code § 59.1–199(c). Accordingly, plaintiff may not premise VCPA liability on conduct concerning the terms and circumstances of defendants' extension of credit to her.

■ Count III alleges that Koons violated Va.Code § 59.1–200(A)(7) by failing to disclose that the Grand Am was a "used" car. Plaintiff supports this argument by pointing to financing documents describing the car as "new" rather than a "demo" or "used" car. The VCPA prohibits "offering for sale goods which are used... without clearly and unequivocally indicating in the...offer for sale that the goods are used." Va.Code § 59.1–200(A)(7). Plaintiff cites Va.Code § 46.2–1500, which defines a "used car" as any vehicle other than a new motor vehicle. "New motor vehicle" is in turn defined to exclude a vehicle which has been used as a "demonstration motor vehicle, or for the personal and business transportation of the manufacturer, distributor, dealer or any of his employees." Koons admits that the car was "used" in the sense of this statute. (Def's. Resp. Pl's. Request for Admissions, ¶ 88–89.)

However, defendant points to the unequivocal deposition testimony of Hodges and Morris that they had been clearly advised that the vehicle they purchased was a "demo" which had been used by dealership employees. Morris was "absolutely" aware it was a demo. (Morris Dep. at 99). Morris anticipated an odometer reading of a few thousand miles. (Morris Dep. at 82). In fact, Hodges signed an odometer disclosure statement showing 10,138 miles. (Def's.Reply, Ex. D.) Morris testified that she took delivery of the vehicle on the same day the mileage was writ-

ten on the statement. (Morris. Dep. at 114). Koons personnel have explained that references to the car as "new" enabled defendant to procure superior rebates and financing options for plaintiff. Koons personnel have explained that because the car had never been titled, it was considered "new" for purposes of eligibility to receive a manufacturer's rebate of $2,000. (Chapura Aff., Def's. Ex. 7 at ¶ 3). In Hodges' case, this rebate provided the bulk of the down payment. Similarly, previously untitled vehicles are considered "new" for financing purposes and eligible to receive superior financing packages. (Chapura Aff. at ¶ 4). Morris recalls that the same explanations were given at the time of sale. (Morris Dep. at 99). Koons argues that because Hodges and Morris clearly understood that the car had been used as a demo, Koons cannot be held liable under the VCPA. Koons cites *McGraw v. Loyola Ford,* 124 Md.App. 560, 723 A.2d 502 (1999), in which the Maryland Court of Special Appeals affirmed summary judgment for a car dealer charged with violating the Maryland Consumer Protection Act and fraud for checking "new" on the Buyer's Order when the plaintiff admitted being advised by a salesman that the car was a demo. Although *McGraw* was decided on the basis of Maryland's statutory scheme, its reasoning is persuasive in the analogous Virginia context. On this record, we find no evidence of Koons' failure to "clearly and unequivocally" advise Hodges and Morris that the car was a "demo" with several thousand miles on it. Summary judgment is thus warranted on Count III.

■ The first "Count IV" alleges that Koons failed to display a Buyer's Guide on the car as required by Va.Code. § 46.2–1530(c). (Compl.¶¶ 55–56). Although the plaintiff nowhere explains precisely how such an omission affirmatively deceived her, Hodges alleges that this constituted a "deceptive trade practice" prohibited by Va.Code. § 59.1–200(A)(14).

Koons responds that § 46.2–1530 provides no private cause of action, and plaintiff fails to respond to this assertion. Title 46.2, Chapter 15 of the Virginia Code establishes a comprehensive scheme of administrative remedies under the auspices of the Motor Vehicle Dealer Board. *See* Va.Code § 46.2–1503.4–1507. It does not create a private right of action. Therefore, summary judgment on the first Count IV is in order.

The second Count IV simply alleges on information and belief that the $289.00 processing fee was a "mandatory fee implemented to inflate the purchase price." (Compl.¶ 61). Discovery produced no evidence to support this claim, and summary judgment in defendant's favor is warranted.

■ Count V pleads an alternative theory to the second Count IV, specifically, that if Koons attributed the processing fee to "tax and title work," then Koons would have misrepresented itself as affiliated with the Commonwealth in violation of the VCPA. (Compl.¶ 66). Because this claim is based solely on a statement in the Primus RISC, through which no credit was extended, we find that this claim is moot. Moreover, any errors in the Primus RISC were corrected in the First Union RISC under which credit was actually extended. For these reasons, we find no merit in this claim and will grant summary judgment on Count V.

C. Breach of Contract Claims

■ Counts VI and VII allege breach of contract as to the Primus RISC and the First Union RISC, respectively. The theory of recovery under Count VI is that Koons breached the contract of sale by failing to provide the title to the car when Hodges signed the Primus RISC on May

16. (Compl.¶ 72). Denial of credit pursuant to this RISC defeated a condition precedent for the parties' obligations, and subsequent funding of the sale pursuant to the First Union RISC supercedes any obligation under the ineffective Primus RISC. Consequently, no contract liability may be soundly based on the Primus RISC and summary judgment on Count VI will be granted.

Count VII alleges Koons to have breached its contract with Hodges under the First Union RISC by failing to deliver a "new" vehicle. Because the RISC says "new" and the actual car was "used" as a "demo," plaintiff concludes that Koons breached its contract of sale. (Compl.¶ 78). However, as noted above, Hodges and Morris understood the car to be a demo and understood the benefits of financing the car as "new". Morris accepted delivery with full knowledge of the odometer readings, then proceeded to drive the car for an additional 60,000 miles and had four collisions with it. This course of conduct is clear evidence that plaintiff and her sister anticipated and acquiesced to receipt of a demo. Therefore, even if Koons breached the literal provisions of the First Union RISC, plaintiff knowingly waived any claim that the contract called for a non-demonstration vehicle and cannot now be heard to allege a breach of contract. *See Stanley's Cafeteria v. Abramson*, 226 Va. 68, 73–74, 306 S.E.2d 870 (Va.1983). Therefore, summary judgment will be granted on Count VII.

## D. Fraud

Count VIII alleges that Koons fraudulently misrepresented to Hodges: a.) that it would transfer title based on the first RISC; b.) the nature of the processing fee; c.) that the fee was for tax and title work; d.) that it would pay $289.00 to public officials; e.) that the brakes were not covered by warranty when they were; f.) that plaintiff had to pay for brake repairs; g.) that the car was new when it was in fact used; and h.) that the car was "new" because it had never been titled. (Compl.¶ 81).

Under Virginia law, a party alleging fraud "has the burden of proving by clear and convincing evidence '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Batrouny v. Batrouny*, 13 Va.App. 441, 412 S.E.2d 721, 723 (1991) (*quoting Winn v. Aleda Constr. Co.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984)).

Koons properly seeks summary judgment on the ground that Hodges, who is the only plaintiff, did not participate in any of the negotiations or read any documents and thus may not, as a matter of law, claim to have relied on any alleged misrepresentations. Moreover, as discussed above, we find that Hodges understood the car to be a demonstration vehicle and acquiesced to financing the car as "new." Plaintiff has also produced no evidence of actual damages. Consequently, summary judgment in defendant's favor is in order.

## CONCLUSION

For these reasons, the Defendants' Motion for Summary Judgment will be GRANTED by an appropriate order. The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, the defendants' Motion for Summary Judgment on all counts is GRANTED, and it is hereby

ORDERED that judgment be and is entered in favor of the defendants on all counts.

The Clerk is directed to enter judgment in favor of the defendants pursuant to Fed.R.Civ.P. 58 and forward copies of this Order to counsel of record.