Carolyn HARPER, Plaintiff,

v.

**LINDSAY CHEVROLET OLDSMOBILE, LLC**

and

**Mercury Finance Company of Virginia, Inc., Defendants.**

**Civil Action No. 01–1773–A.**

United States District Court, E.D. Virginia.

July 12, 2002.

Alexander Hugo Blankingship, III, Blankingship & Associates, P.C., Alexandria, VA, for plaintiff.

Michael Gary Charapp, Charapp Deese & Weiss, L.L.P., Washington, DC, Rebecca Everett Kuehn, Leclair Ryan, Alexandria, VA, Bruce D. White, Brault Palmer Grove Zimmerman White & Steinhilber, L.L.P., Fairfax, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Plaintiff, a dissatisfied purchaser of a used car, sued the seller of the car and a financing company for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* At issue on summary judgment are:

(i) whether TILA disclosures must be made on a document other than the Retail Installment Sales Contract prior to consummation of a purchase;

(ii) whether the disclosures made here satisfy TILA's "conspicuousness" requirement:

(iii) whether the timing of payments made to third parties and the conformity of applicable disclosures with state law is material to a TILA claim; and

(iv) whether plaintiff suffered an "adverse action" within the meaning of the FCRA.

### I.

This action arises out of the circumstances relating to the November 29, 2000 sale of a used automobile to plaintiff Carolyn Harper by defendant Lindsay Chevrolet Oldsmobile, LLC ("Lindsay Chevrolet"). The sale was financed by defendant Mercury Finance Company of Virginia, Inc. ("Mercury Finance").

Plaintiff first visited the Lindsay Chevrolet dealership in Woodbridge, Virginia on November 27, 2000 in response to a "second chance" financing solicitation that offered to help people with poor credit ratings obtain financing to purchase a ve-

hicle. The offer was attractive to plaintiff because she had previously filed for bankruptcy and needed to purchase a car for her work. During her initial visit to the dealership, plaintiff met with a salesman and filled out a credit application, which the salesman used to obtain a credit report. On the basis of the credit report and application, Lindsay Chevrolet's finance manager determined that plaintiff would likely qualify for a certain level of financing from lenders with whom Lindsay Chevrolet regularly dealt. In anticipation of plaintiff receiving financing, the salesman showed plaintiff a 1996 Ford Contour. Plaintiff then left the dealership, but returned the following day to discuss prices and financing.

On that day (November 28, 2000), plaintiff met with a different salesman and discussed the price and financing terms for the car, which were reduced to writing on a "Bookout Sheet" that was forwarded to Mercury Finance. The financing terms discussed and recorded on the Bookout Sheet were a loan at 23% interest for a 36–month term with monthly payments of $277.65.[1] The loan was not yet approved when the terms were discussed, and plaintiff signed no paperwork on November 28th.

On the following day, November 29, 2000, plaintiff returned to finalize the purchase. Mercury Finance, it turned out, approved financing at 25% not 23% which increased the monthly payments by $10.50, to $288.15. Lindsay Chevrolet prepared the required loan and sale documentation (based upon the new 25% interest rate) and Lindsay Chevrolet's representative reviewed the documents with plaintiff, showing her the new monthly payment amount, after which plaintiff executed a Retail In-

---

**1.** The total agreed purchase price was $8,172.63, which included $6910.13 for the car (including taxes), $1022.50 for an extended service contract / warranty, $40.50 for

"license, title and registration fees," and 199.50 as a document fee. Plaintiff agreed to make a $1000 down payment, resulting in a total amount financed of $7172.63.

stallment Sales Contract ("RISC"), a Buyer's Order, an Odometer Disclosure Statement, and a document entitled "Disclosure of Discount; Buyer Representation of Cash Price; Buyer Statement of Voluntary Purchase" (hereinafter "Disclosure Document"). Upon completion of the paperwork, Lindsay Chevrolet gave plaintiff a set of temporary license plates[2] and she drove the vehicle off the lot.

The first page of the RISC plaintiff signed included a section titled "Itemization of Amount Financed." This section disclosed, among other things, that the amount financed included $1,022.50 for "Optional Mechanical Repair Insurance paid to insurance company" (section 4B) and $40.50 for "License, Title and Registration Fees paid to public officials"[3] (section 4F). Directly below the enumerated list in the "Itemization of Amount Financed" section, in the same type size and font as the other disclosures, the RISC stated

> You acknowledge that you are paying the retail price for the items shown above in sections 4A–D and/or F. You further understand that the Seller may retain a portion of those amounts.[4]

This disclosure is separated from the next section of the RISC by a bold line extending the width of the page. The RISC also disclosed that the financing contract might be sold for a discount to Mercury Finance.

The Disclosure Document plaintiff signed recited that she had been given the opportunity to read the completed RISC and to ask any questions she might have concerning that document prior to signing it. It also recited that plaintiff had received and read the Disclosure Document prior to signing the RISC. Finally, the Disclosure Document recited that any charges on the RISC for service contracts or other ancillary items represented the retail price, which might include a profit for the seller.[5]

Some time after the purchase, the car experienced mechanical problems, and plaintiff was dissatisfied with Lindsay Chevrolet's response to her complaints. She filed the instant action on November 19, 2001, asserting federal question jurisdiction and alleging nine federal and state claims. Defendants responded with a motion to dismiss, which was granted[6] without prejudice as to all state claims[7] and one federal claim,[8] leaving only a TILA

---

**2.** Lindsay Chevrolet had previously purchased temporary license plates from the Virginia Department of Motor Vehicles ("Virginia DMV") for $2.00 per set. This is the price set by statute in Virginia for temporary license plates. *See* Va.Code § 46.2–1558.

**3.** Following the purchase, Lindsay Chevrolet sent $245.25 to the Virginia DMV, which included $206.75 in taxes, a registration fee of $26.50, a title fee of $10.00, and an emissions fee of $2.00.

**4.** This "Retention Disclosure" references the charge for mechanical repair insurance in section 4B, but not the charge for license, title, and registration fees in section 4F.

**5.** Indeed, Lindsay Chevrolet did profit from the sale of the "Optional Mechanical Repair

Insurance;" it retained a portion of the $1022.50 plaintiff paid for this insurance.

**6.** *Harper v. Lindsay Chevrolet Oldsmobile, LLC,* Civ. No. 01–1773–A (E.D.Va. Jan. 11, 2002) (order); *Harper v. Lindsay Chevrolet Oldsmobile, LLC,* Civ. No. 01–1773–A (E.D.Va. Feb. 26, 2002) (amended order).

**7.** *See* 28 U.S.C. § 1367(c)(2); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**8.** Plaintiff's Magnuson–Moss Warranty Act claim failed to meet the $50,000 amount-in-controversy threshold required for federal jurisdiction. *See* 15 U.S.C. § 2310(d)(3); *Donahue v. Bill Page Toyota, Inc.,* 164 F.Supp.2d 778 (E.D.Va.2001) (finding that a plaintiff's federal and state claims may not be aggregated to satisfy the amount-in-controversy required for federal jurisdiction).

claim against both defendants. Thereafter, plaintiff was allowed to amend the complaint to add an FCRA claim against both defendants. Lindsay Chevrolet then filed a motion for summary judgment on all counts of the complaint.[9] Plaintiff responded with a motion for partial summary judgment solely on the claim that Lindsay Chevrolet violated TILA by failing to disclose that it was retaining the a portion of the license, title, and registration fee.

## II.

On a motion for summary judgment, the moving party must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The facts themselves, and the inferences to be drawn from those facts, must be viewed in the light most favorable to the nonmoving party. *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that part will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The opposing party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby Inc.,* 477 U.S.

242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, in a case in which the nonmoving party bears the burden of proof at trial, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### A. *Plaintiff's TILA Claims*

Plaintiff asserts essentially three TILA violations:

1. Lindsay Chevrolet's TILA disclosures were made contemporaneously with the sale of the vehicle to plaintiff, in violation of Regulation Z, 12 C.F.R. § 226.17;

2. Lindsay Chevrolet did not "conspicuously" disclose that it was retaining a portion of the charge for the service contract / extended warranty, as required by 15 U.S.C. § 1632(a) and 12 C.F.R. § 226.17(a)(1); and

3. Lindsay Chevrolet failed to disclose that it was retaining a portion of the "license, title and registration fees paid to public officials," thus providing an inaccurate disclosure, in violation of 15 U.S.C. § 1638(a)(12)(B)(iii) and 12 C.F.R. § 226.18(c)(1)(iii).

None of these claims survives summary judgment.

■ TILA was enacted to foster the "informed use of credit" by requiring disclosure of the full price of credit to consumers. 15 U.S.C. § 1601(a); *Mourning v. Family Publications Service, Inc.,* 411

---

9. Mercury Finance did not join in Lindsay Chevrolet's motion for summary judgment; nor did it file a separate motion for summary judgment. Nevertheless, the same facts and legal arguments are in issue, as Mercury Finance had no direct contact with plaintiff and any liability it may have on the claims at issue here is derivative of the liability of Lindsay Chevrolet.

U.S. 356, 364–65, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). To this end, creditors are required to make certain, specific disclosures when extending credit, including the amount financed, the total number of payments, all finance charges, the annual percentage rate, and the identity of the creditor. *See* 15 U.S.C. § 1638(a). Also required is an itemization of the amount financed that includes "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii). TILA further specifies that the required disclosures must be made before credit is extended. 15 U.S.C. § 1638(b)(1). This requirement is repeated in the Federal Reserve's Regulation Z, promulgated pursuant to TILA, which also specifies in what form creditors must make the required disclosures. This regulation states, in pertinent part:

(a) Form of disclosures. (1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep . . . .

(b) Time of disclosures. The creditor shall make disclosures before consummation of the transaction.[10]

12 C.F.R. § 226.17. In sum, to ensure the "meaningful disclosure of credit terms"[11] to consumers, TILA requires that creditors make the required disclosures in writing in a form the consumer can retain, and they must do so before the buyer becomes contractually obligated.

Precisely this occurred in this case. On the day of purchase, but prior to the time plaintiff signed any contract papers, she was provided the completed RISC, a writing in a form she could keep that included all the required disclosures. The record is clear and uncontradicted on this point. Thus, on that same day, plaintiff signed a document entitled "Disclosure of Discount, Buyer Representation of Cash Price, Buyer Statement of Voluntary Purchase" (hereinafter "Disclosure Document"), the first paragraph of which contains the following statement: "I have been given the opportunity to read the Retail Installment Contract, completely filled in, and to ask any questions I have concerning the contract or this document." Paragraph five of the Disclosure Document goes on to say: "I acknowledge that I have received and read this document before signing the Retail Installment Contract and that this document was completely filled in before I signed it." Thus plaintiff acknowledged in the contract documents that she had an adequate opportunity to review the RISC—with all of the sales terms completed—prior to signing it. Further, plaintiff testified at her deposition that Lindsay Chevrolet's sales representative explained the "Itemization of Amount Financed" portion of the RISC and showed and explained other portions of the RISC to her before she signed it. The required disclosures were "contemporaneous" with the consummation of the transaction only in the sense that both occurred the same day at the dealership. TILA does not prohibit this. In sum, the uncontradicted record reflects that plaintiff was shown the requisite TILA disclosures in writing *before* the transaction was consummated, that is, *before* she became contractually obligated.

■ Plaintiff next argues that Lindsay Chevrolet's failure to provide the required disclosures in writing on a document *separate from* the RISC violates TILA. In support, plaintiff cites *Polk v. Crown Auto,*

---

**10.** "Consummation of the transaction" is defined by regulation as occurring when the buyer becomes contractually obligated. 12 C.F.R. § 226.2(a)(13).

**11.** *Mourning,* 411 U.S. at 364, 93 S.Ct. 1652.

*Inc.,* 221 F.3d 691 (4th Cir.2000). Yet, *Polk* does not go so far; it merely holds that an oral disclosure of terms prior to signing the RISC is insufficient.[12] It requires not that the disclosures be on a document separate from the RISC, but only that the written disclosures be made prior to completion of the sale. *See id.* at 692. Thus, *Polk* stands for the straightforward and uncontroversial proposition that Regulation Z means what it says: the required disclosures must be made in writing, in a form the consumer can keep, before consummation of the transaction. *See id.* Again, this is precisely what occurred here. And, as better-reasoned decisions hold, by providing plaintiff the completed RISC before she became contractually obligated, Lindsay Chevrolet complied fully with the TILA requirement that disclosures be made in writing in a form the consumer may keep.[13] TILA requires no writing in addition to the RISC.

 Plaintiff's second TILA claim— that Lindsay Chevrolet did not conspicuously disclose it was retaining a portion of

the $1,022 charge for the service contract—is unsupported by the record and fails as a matter of law. TILA mandates that required terms be "clearly and conspicuously" disclosed,[14] which means only that the disclosures must be "in a reasonably understandable form and readily noticeable to the consumer."[15] And significantly, conspicuousness is a question of law under TILA that is governed by an objective, reasonable person standard.[16]

The disclosure plaintiff complains of is on the first page of the RISC under the heading "Itemization of Amount Financed." Five numbered sections appear under this heading. Section 4 is titled "Other Charges Including Amounts Paid to Others on Your Behalf." Section 4B lists $1,022.50 as "Optional Mechanical Repair Insurance paid to insurance company." Directly below Section 5, in the same font and typeface as the itemized disclosures and separated from the next part of the form by a bold line running the width of the page, is the following disclosure:

> You acknowledge that you are paying the retail price for the items shown

---

**12.** In *Polk*, the automobile dealer explained the credit terms to the consumer prior to consummating the sale, but did not provide the consumer with the credit terms in written form until after the sale had been consummated. *See Polk*, 221 F.3d at 691.

**13.** *See Gavin v. Koons Buick Pontiac GMC, Inc.*, 28 Fed.Appx. 220 (4th Cir.2002) (unpublished disposition) (allowing the customer to review the written credit agreement prior to signing satisfied TILA's disclosure requirement); *Tripp v. Charlie Falk Auto*, 2001 WL 1105132 (E.D.Va. Aug 22, 2001) (same); *Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F.Supp.2d 535. 548 (E.D.Va.2001) ("[P]rovision of a RISC with all of the sales terms prior to signature grants a buyer the opportunity to review the terms prior to signing, and to defer signing if the terms are not agreeable."). *But see Walters v. First State Bank*, 134 F.Supp.2d 778 (W.D.Va.2001) (finding that a separate copy of the required disclo-

sures must be given to the consumer before consummation of the purchase); *Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321 (W.D.Mich.2000) (same).

**14.** 15 U.S.C. § 1632(a); 12 C.F.R. § 226.17(a)(1)

**15.** 12 C.F.R Pt. 226, Supp. I, cmt. 5a(a)(2).

**16.** *See Smith v. Check–N–Go of Illinois, Inc.*, 200 F.3d 511, 515 (7th Cir.1999) ("[T]he inquiry must be objective, which makes the question legal rather than factual. If we were to treat the determination of conspicuousness as a matter of 'fact,' then the regulation would fail in its purpose."); *see also Herrera v. First Northern Savings & Loan Ass'n*, 805 F.2d 896, 900 (10th Cir.1986) (treating compliance with the conspicuousness requirement of 12 C.F.R. Pt.226 as a legal rather than factual matter); *Dixey v. Idaho First National Bank*, 677 F.2d 749 (9th Cir.1982) (same).

above in sections 4A–D and/or F. You further understand that the Seller may retain a portion of those amounts.

(hereinafter "Retention Disclosure"). Plaintiff does not contest the adequacy of the Retention Disclosure's language; this language plainly satisfies TILA.[17] Instead, plaintiff argues that the disclosure is not sufficiently conspicuous.

As noted, TILA requires that *all* disclosures be clear and conspicuous. TILA further mandates that the "annual percentage rate" and "finance charge" terms be disclosed *more* conspicuously than other terms.[18] From this it follows that all required disclosures other than the annual percentage rate and finance charge may be equally conspicuous; the disclosures that are part of the itemization of the amount financed are not subject to any special conditions with respect to *relative* conspicuousness. The Retention Disclosure in issue here falls into this category of disclosures and thus is appropriately in the same typeface and font as the other disclo-

sures in this category. TILA does not require more.[19] The placement of the Retention Disclosure here with respect to the other disclosures [20] is such that a reasonable consumer would notice it, making it conspicuous as a matter of law. *See Check–N–Go,* 200 F.3d at 515–16 (7th Cir. 1999).[21]

■ Plaintiff's third TILA claim is based on the requirement that TILA disclosures be accurate.[22] Plaintiff claims that Lindsay Chevrolet violated that requirement by representing in section 4E of the RISC that it collected $40.50 in license, title, and registration fees, but then paid the Virginia DMV less than that amount, retaining the difference as undisclosed profits. Plaintiff fails, however, to adduce any evidence that Lindsay Chevrolet did not accurately disclose the charges paid to the Virginia DMV. To the contrary, the record evidence compels the opposite conclusion. The $40.50 fee plaintiff was charged for "License, Title and Registration fees paid to public officials" may be itemized as follows: [23]

---

**17.** *See Gibson v. Bob Watson Chevrolet–Geo, Inc.,* 112 F.3d 283, 286 (7th Cir.1997) (holding, in dicta, that a dealer may disclose that he is retaining a portion of the charge without disclosing the exact amount retained); *see also* 12 C.F.R.Pt. 226, Supp. I § 18(c)(1)(iii)(2) (suggesting wording very similar to that used by defendants here).

**18.** *See* 15 U.S.C. § 1632(a); 12 C.F.R. § 226.17(a)(2).

**19.** That defendants could have done more to make the Retention Disclosure conspicuous by adding stars, or bold type, or some other device does not mean that the existing disclosure, as a matter of law, is insufficiently conspicuous.

**20.** Because the Retention Disclosure and the numbered sections to which it refers are grouped under the "Itemization of Amount Financed" heading and separated from other, unrelated disclosures by a bold line extending the width of the page, it is clear that the

Retention Disclosure does not refer to other parts of the RISC.

**21.** Plaintiff argues in her opposition to Lindsay Chevrolet's motion for summary judgment that Lindsay Chevrolet has not done enough to show that the contested disclosure *is* conspicuous. But in doing so, plaintiff fails to recognize that the determination of conspicuousness is a question of law, not fact.

**22.** TILA's requirement is straightforward. A creditor must provide "a written itemization of the amount financed," including "each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person." 15 U.S.C. § 1638(a)(2)(B)(iii). The reference to the third person may be made using generic or other general terms in the case of payments to public officials or government agencies. *See* 12 C.F.R. § 226.18(c)(iii) n. 41.

**23.** The $40.50 fee was not itemized on the RISC plaintiff received, but TILA does not

| | |
|---|---|
| $26.50 | registration fees, pursuant to Va.Code §§ 46.2–694(A)(1) & (13) and 46.2–1168 |
| $ 2.00 | emissions fee due to locality, pursuant to Va.Code § 46.2–1182.1 |
| $10.00 | certificate of title fee, pursuant to Va. Code § 46.2–627 |
| $ 2.00 | temporary license plate fee, pursuant to Va.Code § 46.2–1558 [24] |

Plaintiff does not dispute that these are amounts she could have properly been charged for the services she received, and plaintiff, in her motion for partial summary judgment acknowledges that there is no dispute of material fact. To support her claim, plaintiff asserts (i) that defendants cannot prove that the above amounts were actually submitted to the Virginia DMV because defendant's exhibit to its summary judgment memorandum that showed the payment was not produced during discovery,[25] and (ii) that the $2.00 ostensibly collected from plaintiff for temporary license plates was not passed on *directly* to the Virginia DMV because Lindsay Chevrolet bought the temporary license plates before plaintiff purchased her car.

With respect to whether Lindsay Chevrolet paid the fees on Harper's behalf to the Virginia DMV, plaintiff has produced no evidence that the fees were not paid. Instead, she concedes that Lindsay Chevrolet paid $38.50 subsequent to the purchase, and the Virginia statute, as well as record evidence, establishes that Lindsay Chevrolet paid $2.00 for the temporary license plates given to plaintiff. The only reasonable inference that can be drawn from the record is that the entire $40.50 was paid to the Virginia DMV, with none retained by Lindsay.[26]

Plaintiff then argues that it is significant that the dealer purchased and paid for the temporary license plates prior to plaintiffs transaction and was not required to charge plaintiff for the temporary license plates. Yet, the timing of the payment to the Virginia DMV and the lack of a statutory requirement that Lindsay Chevrolet charge plaintiff for the temporary license plates are immaterial. The RISC disclosure says nothing about the timing of the payment, nor is it required to do so. The sole, relevant question is the accuracy of the disclosure: Was $40.50 paid to public officials for "license, title and registration fees" for plaintiff? The undisputed answer is "yes." Lindsay Chevrolet paid $2.00 for the temporary license plates in advance and then passed the charge to plaintiff. Lindsay Chevrolet also paid the other $38.50 for registration, title, and emissions fees subsequent to the sale.

Plaintiff also contends that Lindsay Chevrolet violated TILA because it failed to itemize the license, title, and registration fees on the buyer's order as required by Va.Code § 46.2–1530.[27] Lindsay Chev-

---

require that it be itemized. It merely requires that $40.50 was actually paid to "public officials," in this case the Virginia DMV.

24. The Virginia statute sets the fee that dealers pay for temporary license plates at $2.00 and specifically permits dealers to pass on that fee to buyers (but does not require dealers to do so). Va.Code § 46.2–1558.

25. The contested exhibit, Exhibit 5 to Lindsay Chevrolet's motion for summary judgment, shows a transfer from Lindsay Chevrolet to the Virginia DMV on behalf of Carolyn Harper in the amount of $245.25, which included $206.75 in taxes and $38.50 in other fees.

26. Even without the contested summary judgment exhibit—uncontradicted deposition testimony of Lindsay Chevrolet's agent confirms that $40.50 was paid to the Virginia DMV at some time for plaintiff's benefit.

27. The Virginia statute requires a dealer to complete a buyer's order for each sale or exchange of a motor vehicle. The buyer's order is required to include, among other things,

> The amount of any sales and use tax, title fee, uninsured motor vehicle fee, registration fee, or other fee required by law for which the buyer is responsible and the dealer has collected. Each tax and fee shall be individually listed and identified.

Va.Code § 46.2–1530. The statute does not create a private right of action for violations;

rolet's failure to itemize the license, title, and registration fees may be a violation of a Virginia statute, but that is immaterial to whether there was a TILA violation. TILA does not incorporate state disclosure requirements and does not require the itemization that plaintiff requests.

In sum, plaintiff fails to produce any evidence to indicate that the disclosure in section 4E of the RISC for "License, Title and Registration fees paid to public officials" was inaccurate. Instead, clear record evidence reflects that the disclosure was accurate, and plaintiff's claim on this point must fail.

Because each of plaintiff's TILA claims is unsupported by the facts or by applicable law, Lindsay Chevrolet's motion for summary judgment on plaintiff's TILA claims must be granted.

## B. Plaintiff's FCRA Claim

■ Plaintiff's sole FCRA claim focuses on the change in the loan interest rate from the initially discussed 23% to the finally agreed upon 25%.[28] Specifically, she contends that this event triggered both defendants' statutory obligation to provide plaintiff with notice of an "adverse action," as required by 15 U.S.C. § 1681m.[29]

The statutory definition of "adverse action" includes a "refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d)(6).[30] The Federal Reserve's implementing regulations further define "adverse action" as follows:

> Adverse action. (1) The term means: (i) A refusal to grant credit in substantially the terms requested in an application unless the creditor makes a counter offer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered.

12 C.F.R. § 202.2(c)(1)(i). Significantly, the regulations exclude from the definition of "adverse action" any credit denials that are coupled with "counteroffers"—or a "grant [of] credit in a different amount or on other terms." *Id.* Thus, a denial of credit coupled with a counteroffer that is accepted by the applicant does not trigger the FCRA's notice requirement because the applicant has suffered no "adverse action." This principle finds firm support in the caselaw.[31]

---

28. Plaintiff claims for the first time in her opposition to Lindsay Chevrolet's motion for summary judgment that the decision of the Lindsay Chevrolet salesman to show plaintiff only one car was also an "adverse action" under the FCRA. This claim was not made in plaintiff's amended complaint. Additionally, plaintiff does not identify any authority that would support such a claim, nor has any been found.

29. Section 1681m establishes the "duties of users taking adverse actions on the basis of information contained in consumer [credit] reports." Such duties include providing to the consumer (i) notice of the adverse action, (ii) information about the consumer reporting company that provided the credit report on which the adverse action was based, and (iii)

instead the Virginia Motor Vehicle Dealer Board is authorized to assess civil penalties. Va.Code § 46.2–1507.

notice of the consumer's right to obtain a free copy of her credit report and dispute the accuracy or completeness of any information in the report.

30. The definition of "adverse action" in the FCRA is drawn from the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq. See* 15 U.S.C. § 1681a(k)(1)(A).

31. *Diaz v. Virginia Housing Development Authority,* 117 F.Supp.2d 500, 504 (E.D.Va. 2000); *see also Dorsey v. Citizens & Southern Financial Corp.,* 678 F.2d 137, 139 (11th Cir. 1982), *withdrawn* 687 F.2d 140, *reinstated* 706 F.2d 1203 (holding that rejection of a credit application followed by a counteroffer that the applicant accepts is not an adverse action and does not trigger the notification provisions).

The undisputed facts of this case reflect that plaintiff accepted defendants' counter-offer of a loan at 25% after her application for a loan at 23% had been rejected.[32] Accordingly, plaintiff suffered no "adverse action," none of the FCRA's notice requirements were triggered, and summary judgment must be granted for Lindsay Chevrolet on plaintiff's FCRA claim.

## III. CONCLUSION

In light of the uncontested facts, plaintiffs claims against Lindsay Chevrolet fail as a matter of law, and Lindsay Chevrolet's motion for summary judgment must be granted. Though Mercury Finance has not moved for summary judgment, the complaint must also be dismissed against Mercury Finance, as plaintiff's TILA and FCRA claims against Mercury Finance are derivative of her claims against Lindsay Chevrolet. An appropriate order has issued.[33]

---

**32.** Plaintiff's argument against granting summary judgment on this ground relies on a tortured examination of whether there was a true offer and counteroffer. Yet an offer and counteroffer is clearly what occurred and is precisely what plaintiff alleges in her complaint. Lindsay Chevrolet obtained a report of plaintiff's credit history and determined that plaintiff would probably qualify for credit. Lindsay Chevrolet and plaintiff then discussed credit terms that included a 23% interest rate. Plaintiff decided to go ahead with the purchase at that rate and thus made an offer to borrow a certain amount of money at 23%. Defendants did not approve a loan at 23% and instead counter-offered plaintiff a loan at 25%, which plaintiff accepted. Regardless of how plaintiff attempts to characterize the transaction, what occurred was clearly an offer and counteroffer.

**33.** The order also reflects that the result reached here renders moot defendant's pending motion in limine.