Emily **RUCKER**, Plaintiff,

v.

**SHEEHY ALEXANDRIA, INC., d/b/a Sheehy Honda**, Defendant.

No.  **CIV.A.02–466–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 16, 2002.

Alexander Hugo Blankingship, III, Blankingship & Associates P.C., Alexandria, VA, for Plaintiffs.

Jodi Victoria Zagorin, Hudgins Law Firm, P.C., Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This action arises from the sale and spot delivery[1] of an automobile. The consumer drove away in the automobile after signing a first sales agreement conditioned on certain financing. When that financing fell through, the consumer returned to the dealership some ten days later and signed a second sales agreement, which was backdated ten days and based on different financing.

The novel question presented is whether the disclosures in the second agreement violate the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, by calculating the annual percentage rate of interest (APR) on the basis of the date on the backdated agreement rather than the date the transaction was consummated.

### I.

The record reflects the following undisputed material facts: Plaintiff Emily Rucker is a Virginia citizen who purchased a car in April 2001 from the defendant Sheehy Alexandria, Inc., a automobile dealer doing business under the name of Sheehy Honda. On April 3, 2001, Rucker contracted to purchase a 1998 Honda Civic from Sheehy. She executed a buyer's order, a retail installment sales contract (RISC), and a bailment agreement. Under the terms of the April 3 RISC, Rucker provided a $1,000 down payment and fi-

nanced $13,576.68 at 22.95% APR over 5 years. The total finance charge was $9,582.72, resulting in total payments on the car, including down payment, of $24,159.40. The first monthly payment of $386.99 was due on May 18, 2001, 45 days after the consummation of the transaction. The buyer's order and bailment agreement made clear that this was a spot delivery, because the sale was conditioned upon financing being obtained from a third party lender according to the terms of the RISC within five days from the date of the agreements. Rucker drove the car home on April 3. Sheehy was unable to obtain financing on the terms offered in the first RISC. In a series of six facsimile transmissions, all dated April 3, the financing companies contacted by Sheehy declined to make the loan on the proposed terms. By its terms, the April 3 agreement became null and void when Sheehy was unable to obtain financing within five days. Nonetheless, Sheehy made no effort to contact Rucker at that time and ask her to return the car.

On April 13, 2001, Sheehy received a counteroffer from Mercury Finance, approving a loan of up to $11,000 at an APR of 24.95%. After receiving this counteroffer Sheehy asked Rucker, who was still in possession of the car, to return to the dealership. Although the parties dispute what reason the dealership gave Rucker for returning, it is clear that Sheehy did not tell her that the original financing offer had fallen through.[2] Upon Rucker's return on or after April 13, 2001, a second

---

1. In a spot delivery transaction, the buyer takes possession of the vehicle pursuant to financing terms which have been agreed upon by the parties, but not yet accepted by a third party lender. In the event the lender rejects the financing terms, the agreement between the buyer and the seller is null and void. A spot delivery sale is used to allow the buyer to take possession of the car before the financing is approved.

2. Two other claims brought by Rucker against Sheehy, a fraud claim and a Virginia Consumer Protection Act (VCPA) claim, Va.Code § 59.1–196 *et seq.*, center on the representations made to Rucker concerning the reason for her return to the dealership, and allegedly misleading statements about the terms of the April 13 agreement. These disputed allegations are not material to the TILA claim, which turns on the timing and accuracy of the credit disclosures which are in the record and

agreement was reached, according to which Rucker provided an additional $1,000 down payment, while the dealer eliminated a $943.77 extended service warranty from the contract, and lowered the price of the car by $614.65. These changes lowered the amount financed to meet the lender's limit. Under the terms of the second RISC, Rucker financed $10,998.77 at 24.95% over 4 years. The finance charge came to $6,672.91, resulting in total payments under the second deal of $19,671.68. The first monthly payment, now $368.16, was still due on May 18, 2001.

The terms of the two agreements are summarized in the table below:

|  | April 3 | April 13 |
|---|---|---|
| Sale Price | $12,998.00 | $12,383.35 |
| Total Cash Price (including taxes and fees) | $13,632.91 | $12,998.77 |
| Extended service warranty | $ 943.77 | not provided |
| Down Payment | $ 1,000 | $ 2,000 |
| Amount Financed | $13,576.68 | $10,998.77 |
| Annual Percentage Rate (APR) | 22.95% | 24.95% (beginning on April 3) |
| Finance Charge | $ 9,582.72 | $ 6,672.91 |
| Total Payments (including down payment) | $24,159.40 | $19,671.58 |
| Term of Loan | 5 years | 4 years |
| Monthly Payment | $ 386.99 | $ 368.16 |
| First Payment Due | May 18, 2001 | May 18, 2001 |

A comparison of these agreements reveals that, even though the monthly payment and the total payment over the life of the loan were lower in the April 13 agreement, the terms of the April 13 agreement were less favorable to Rucker than the April 3 terms had been. Under the April 13 agreement, Rucker was required to pay more money down, and to pay off the loan over a shorter period of time. Also, she was charged a higher APR to finance a smaller sum. Additionally, she received less value under the April 13 deal, since the extended warranty, a near $1,000 value, was not included in that transaction as it had been in the April 3 agreement. The only concrete benefit of the second deal was the dealership's reduction in price of $614.65.

Although the second agreement was reached on or about April 13,[3] the April 13

---

not in dispute. *See* Def. Ex. 4, 10. The fraud and VCPA claims have been dismissed, without prejudice by agreement of the parties, to be pursued in state court. *See Rucker v. Sheehy,* Civil Action No. 02–466–A (E.D.Va. October 9, 2002) (Order).

3. Neither party remembers precisely when Rucker returned to the dealership and executed the second deal. However, the parties agree that she was asked to return after Sheehy received the April 13 counteroffer, and that the documents were signed sometime on or after April 13, 2001. Therefore,

buyer's order and RISC were backdated to April 3, the date of the original and now void agreement between the parties and the date Rucker took possession of the car. The April 13 RISC, therefore, provides no clue on its face that it actually represents a second offer which was entered into well after Rucker took possession of the car. Most significantly for this case, the backdating of the April 13 RISC also resulted in Rucker being charged interest beginning on April 3, even though the agreement pursuant to which that interest was calculated and charged was not reached until ten days later. According to Sheehy, it is industry practice for car dealers to use the date of delivery of the vehicle on subsequent agreements reached in spot delivery transactions, and banks will only accept buyer's orders containing the date of delivery of the vehicle.

On these facts, Rucker filed a complaint asserting the following claims:

*Count I:* violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

*Count II:* violations of TILA, 15 U.S.C. § 1601 *et seq.*

*Count III:* violation of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

*Count IV:* violations of the Virginia Consumer Protection Act, Va.Code § 59.1–196 *et seq.*

*Count V:* Breach of Contract

*Count VI:* Fraud

Rucker filed a motion for partial summary judgment with respect to Count II and Sheehy filed a cross motion for summary judgment on all counts. On September 10, 2002, after oral argument on the motions, Sheehy's motion for summary

judgment was granted with respect to Counts I, III and V, and denied with respect to Counts IV and VI.[4] The cross motions for summary judgment on Count II were taken under advisement. For the reasons stated in court and presented below, Rucker was granted summary judgment on the Count II TILA claim by Order dated October 9, 2002.[5]

## II.

No controlling circuit authority addresses the question whether the backdating of the April 13 RISC constitutes a violation of TILA, 15 U.S.C. § 1601 *et seq.* Accordingly, analysis of the question presented properly begins with an examination of the stated purposes of the statute and the relevant statutory and regulatory language.

The goal of TILA is to "assure a meaningful disclosure of credit terms" to promote the "informed use of credit" and to "protect the consumer against inaccurate and unfair credit billing … practices." TILA, 15 U.S.C. § 1601(a). To this end, TILA requires lenders to make certain prominent disclosures when extending credit, including the amount financed, all finance charges, and the APR. *Id.* at § 1638(a). The disclosed APR must be accurate to within one-eighth of one per cent of the properly calculated actual APR. *See* 15 U.S.C. § 1606(c). And, Regulation Z, promulgated by the Federal Reserve pursuant to TILA, provides detailed and complex instructions for accurate APR calculation. *See* 12 C.F.R. § 226 app. J(b)(2).

Consistent with TILA's goals, the timing of these required disclosures is critical. The required information must be dis-

---

for convenience, the date of the second agreement is assumed to be April 13, 2001.

**4.** *See Rucker v. Sheehy,* Civil Action No. 02–466–A (E.D.Va. September 10, 2002) (Corrected Order).

**5.** *See Rucker v. Sheehy,* Civil Action No. 02–466–A (E.D.Va. October 9, 2002) (Order).

closed "before credit is extended," 15 U.S.C. at § 1638(b)(1), or, according to Regulation Z, "before consummation of the transaction," 12 C.F.R. § 226.17. Consummation, in turn, is defined by Regulation Z as "the time that a consumer becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2(a)(13); *see Cades v. H & R Block, Inc.,* 43 F.3d 869, 876 (4th Cir.1994); *Harper v. Lindsay Chevrolet,* 212 F.Supp.2d 582, 587 (E.D.Va.2002). In this respect, the Fourth Circuit recently held that the then-existing industry practice of providing the disclosures only after the consumer had signed the agreement was a clear violation of TILA and Regulation Z. *See Polk v. Crown Auto, Inc.,* 221 F.3d 691, 692 (4th Cir.2000).

▮ The April 13 RISC agreement presents two questions concerning TILA compliance. First, were the required disclosures timely, even though the agreement retroactively charged interest dating to April 3, ten days before the disclosures occurred? Second, was the APR properly calculated based on the nominal date of the agreement rather than the actual date of its signing? The answer to these questions hinges on the determination of the proper "consummation date" for the purposes of TILA.

Rucker contends that April 13 is the proper consummation date. Although Sheehy's arguments have been somewhat inconsistent, the most recent filing asserts that the deal "must have been consummated on April 3, 2001," although the terms of the April 3 RISC were superseded by the April 13 RISC. Yet, both parties agree that the April 3 agreement was rendered null and void by its terms when financing on the originally agreed upon terms was not obtained within five days.[6] The April 3 date of the first agreement is therefore not relevant in considering the parties' current contractual obligations. The fact that Rucker took possession of the car on April 3 is likewise irrelevant. According to Regulation Z, consummation occurs not when the consumer takes possession of the product, but at the "time that a consumer becomes contractually obligated on a credit transaction," 12 C.F.R. § 226.2(a)(13); *see Cades v. H & R Block, Inc.,* 43 F.3d at 876. Not until the April 13 agreement was signed by the parties did they become "obligated on a credit transaction." [7] This second agreement is the surviving agreement by which the parties remain bound, and according to which Rucker has continued to make her payments due on the loan. In sum, because Rucker did not become obligated on the credit transaction until April 13, that is the date the transaction was consummated under TILA.

Two conclusions flow inexorably from the conclusion that April 13 is the proper date for the consummation of the transaction. First, the required TILA disclosures were timely. It is undisputed in the record that the April 13 RISC was filled out with all the required terms when it was presented for Rucker's signature. That is sufficient to meet the TILA temporal requirements set forth in § 1638(b)(1) and Regulation Z. *See Harper,* 212 F.Supp.2d at 587; 15 U.S.C. § 1638(b)(1); 12 C.F.R. § 226.17. The backdating of the second RISC agreement does not alter the fact that the required information was dis-

---

6. In fact, Sheehy relied on this argument to defeat Rucker's breach of contract claim, which was based on the April 3 agreement. *See Hodges v. Koons Buick Pontiac GMC, Inc.,* 180 F.Supp.2d 786, 795–96 (E.D.Va.2001) (no contract liability may be based on an agreement voided for failure to obtain financing).

7. In the latest filing, Sheehy seeks to portray the second RISC as a "counteroffer" to the April 3 RISC, which Rucker then accepted. *See* Def. Supp. Br. at 3. Even if this were true, it would not change the fact that neither party was obligated by the second RISC until this counteroffer was accepted on April 13.

closed to Rucker before she became contractually obligated.

■ The second conclusion that follows from the April 13 consummation date is that the APR figure disclosed on the April 13 RISC is inaccurate. The APR must be calculated according to the Regulation Z instructions. *See* 12 C.F.R. 226 app. J(b). According to the current version of Regulation Z, "[t]he term of the transaction begins on the date of its consummation, except that if the finance charge or any portion of it is earned beginning on a *later* date, the term begins on a later date." *See id.* (emphasis added). Thus, the Regulation Z does not permit calculation of the APR based on an interest accrual date which is earlier than the consummation date. By contrast, the previous version of Regulation Z was more flexible, directing only that the "term of the transaction commences on the date of its consummation, except that if the finance charge begins to accrue on *any other* date, the term of the transaction shall be the date the finance charge begins to accrue." *See* 12 C.F.R. § 226.40(b)(1) (pre-October 1, 1982 version) (emphasis added).[8] Under the current Regulation Z, however, "accrual dates *prior* to the date of consummation are apparently prohibited." *See Krenisky v. Rollins Protective Services Co.,* 728 F.2d 64, 67 n. 3 (2nd Cir.1984).

In this case, the APR should have been calculated based on a term starting April 13, the consummation date, not April 3, the nominal date of the April 13 agreement. Based on the amount financed, the finance charges and the monthly payment sched-

ule presented in the April 13 RISC, the properly calculated APR, using an accrual date of April 13, was 25.35%. See Pl. Supp. Br. Ex. C. Using the improper accrual date of April 3 led to the disclosed APR of 24.95%. *See* Pl. Supp. Br. Ex. D. This .4% difference is outside the one-eighth of one percent, or .125% tolerance allowed by the statute, resulting in a violation of TILA. *See* 15 U.S.C. § 1606(c). Thus, Rucker is entitled to statutory damages for the improper disclosure of the APR on the April 13 RISC.

■ To be sure, this seems to be no more than a minor technical error. Yet, it is clear that such errors may not be ignored. TILA is a technical statute, and should be strictly enforced. *See Mars v. Spartanburg Chrysler Plymouth, Inc.,* 713 F.2d 65, 67 (4th Cir.1983) (holding that TILA should be "absolutely complied with and strictly enforced," and finding a violation for improper type size and minor variations in required language). Moreover, this technical TILA regulation supports the statute's substantive goals by fostering "meaningful disclosure of credit terms" and "protect[ing] the consumer against inaccurate and unfair credit billing ... practices." 15 U.S.C. § 1601(a). Allowing the imposition of interest accrual dates prior to the consummation date undermines the clarity and usefulness of the disclosed information, particularly the APR. Altering the length of the first payment period can have a significant effect on the APR; in this case the interest accrual date ten days prior to the consummation date lowered the disclosed APR by .4%, or almost one half of one percent.[9] The potential for

---

**8.** Under the pre-October 1982 regulations, this greater flexibility was counterbalanced by a disclosure requirement. The previous version of the implementing regulations required that the accrual date be disclosed if different from the date of the transaction. *See* 12 C.F.R. § 226.8(b)(1)(pre-October 1, 1982 version); *Krenisky v. Rollins Protective Services*

*Co.,* 728 F.2d 64, 67 n. 3 (2nd Cir.1984). Current regulations do not. *See* 12 C.F.R. §§ 226.17, 226.18.

**9.** An earlier accrual date in effect lengthens the term of the loan. If the monthly payment schedule and amounts are held constant, the result of the longer term will be to lower the

APR manipulation clearly undermines the comparability of APR figures. And, few consumers are aware of the effect that the interest accrual date has on the APR. Moreover, TILA does not require that the interest accrual date be displayed prominently along with other key disclosures, such as the APR itself or the finance charge. *See* 12 C.F.R. §§ 226.17, 226.18. In this case, the retroactive interest accrual date used by the dealer was arguably signaled by the backdating of the agreement. Yet, the nominal contract date appears only after Rucker's signature at the bottom of the second page, far removed from the prominent TILA disclosures at the top of the first page. Its significance is hardly self-evident. Even if consumers were aware of the sensitivity of the APR to changes in interest accrual dates, they would need to perform complex calculations to gauge the difference between the APR calculated on the nominal date of a backdated agreement versus the actual date of consummation. There is no reason for consumers to bear this burden. The implementing regulations simplify matters by prohibiting earlier accrual dates which would result in understated APRs. This renders the disclosures more comparable and helps to "assure a meaningful disclosure" of the APR. 15 U.S.C. § 1601(a).[10]

The prohibition against the use of interest accrual dates that antedate the consummation of transactions not only provides consumers greater opportunity to shop for better terms, but also furthers the fairness of credit contracts. This ban on retroactive interest obligations ensures that the terms of the transaction are set in stone before the consumer becomes obligated, so that a lender cannot surprise a consumer with higher than expected or suddenly changing rates. This furthers TILA's goal of "protect[ing] the consumer against inaccurate and unfair credit billing ... practices." 15 U.S.C. § 1601(a).

The combination of spot delivery contracts and the industry practice of backdating documents to the original delivery date creates a real potential for abuse. Detractors of spot delivery transactions point out that such transactions allow the following fraudulent "yo-yo" sales strategy:[11] A dealer lures a prospective buyer with a financing deal which is unlikely to win approval. The buyer is then allowed to drive away in the car and consider herself the owner for a period of time, only to be called back in when the financing terms are rejected. Back at the dealership, the buyer is persuaded to sign a second deal, backdated to the original date of delivery, with less favorable financing terms. At this point, the buyer is quite likely to sign the deal, even if she may have balked at the terms as an original matter. Psychologically, the buyer has been given a week to become attached to the car, and is less likely to shop around. The buyer is likely unaware of her right to

effective APR because the credit is being extended over a longer period of time for the same payments. A later accrual date has the opposite effect, shortening the time of the loan while keeping the payments the same, resulting in a higher effective APR.

**10.** Sophisticated parties can choose monthly payment rates and schedules which reflect the imposition of an agreed upon retroactive interest rate, provided the *disclosed* APR is calculated according to the regulations. In this case, for example, the parties could have agreed that Rucker would be charged 24.95% interest beginning on April 3. However, to protect less sophisticated parties, the disclosure form must still disclose the properly calculated APR, here the 25.35% figure.

**11.** *See Mayberry v. Ememessay, Inc.,* 201 F.Supp.2d 687, 695 (W.D.Va.2002) (describing the potential for fraudulent abuse of spot delivery transactions in a yo-yo sales scheme); *Janikowski v. Lynch Ford, Inc.,* 210 F.3d 765, 768 (7th Cir.2000) (same).

return the car she thinks she has already bought. Indeed, she may not have been told that the original financing fell through, and she may be misled into thinking that the second deal is a better deal. In these circumstances, a buyer will not wish to return the car and face the embarrassment of having to explain to family and friends that she lost the car because she was not creditworthy.[12] Once the backdated contract is signed, there is no evidence on the face of the controlling legal documents that the terms of the deal which the consumer signed actually changed after she took possession of the car. Some of the elements of a yo-yo sales scheme appear in the present case, except that there is no record evidence here that the dealer set out to mislead the consumer through a yo-yo strategy. In any event, the potential for abuse is obvious in transactions involving a spot delivery and backdating of a RISC.

■ It is noteworthy, however, that neither TILA nor Regulation Z prohibits spot delivery transactions; absent some independent showing of fraud or misrepresentation spot delivery transactions are not illegal.[13] Nor does the spot delivery in

this case run afoul of TILA. Instead, the TILA transgression here results from the backdating of the second RISC and the corresponding use of the earlier date to calculate the APR improperly in violation of TILA's Regulation Z.[14] Sheehy should have properly dated the second RISC, and charged interest beginning on the consummation date. If Sheehy wants to recover payment from the consumer for the use of the car prior to the second agreement, it should explicitly provide for some rent to be paid for this time period in the original conditional contract.[15]

■ The only question remaining on Rucker's TILA claim is what damages are due to her as a result of the violation. The civil liability provisions of TILA allow plaintiffs to sue for "any actual damage sustained" as a result of defendant's failure to comply with the statute. *See* 15 U.S.C. § 1640(a)(1). Rucker claims actual damages of $76.22, the amount of extra interest charged during the first payment period because of the additional ten days of interest accrued due to the backdating. Yet, Rucker is not entitled to recover actual damages in this case. This is so because the record indicates that she read

---

12. The pressure to sign can be ratcheted up yet further if the dealer has already sold a trade-in car at this point, leaving the consumer literally stranded without a car if she does not sign on to the new deal. *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 143 F.Supp.2d 535, 540 (E.D.Va.2001).

13. *See, e.g., Tripp v. Charlie Falk Auto*, 2001 WL 1105132 at *6 (E.D.Va.2001) (holding that conditioning a sales contract on financing approval did not render the disclosed terms estimates or violate the timing requirement); *Janikowski*, 210 F.3d at 769 (holding that spot delivery does not violate TILA).

14. This holding is not inconsistent with *Hodges. See Hodges*, 180 F.Supp.2d at 793. *Hodges* did not involve, as here, a TILA claim that the APR was incorrectly computed because it was based on the first agreement's interest

accrual date. Instead, in *Hodges*, the plaintiff's claims that RISC backdating was fraudulent and that it rendered disclosures untimely were rejected because (i) the buyers were aware of the backdating, (ii) the terms of the second RISC were more favorable than the first, and (iii) the plaintiff never articulated how the backdating caused actual harm. *See id.* Though the buyer's awareness of the backdating may be relevant to fraud and timeliness claims, it is not relevant to the TILA claim presented here, and not presented in *Hodges*, that backdating results in the inaccurate disclosure of the APR.

15. *See Tripp*, 2001 WL 1105132 at *1 (Contract provided that, in the event the contract was voided due to failure to obtain financing, the buyer would owe rent of one-half the allowable Internal Revenue Service rate per mile that the customer drove the vehicle.).

none of the documents presented to her in either the April 3 or the April 13 agreement. Therefore, she cannot show that she relied on the disclosures in those documents in any way. There is no evidence that she would have negotiated further or shopped around for better credit terms had the APR been properly presented; thus Rucker cannot show that the APR violation proximately caused her any injury. *See Hodges,* 180 F.Supp.2d at 792 n. 6 ("To recover actual damages, the plaintiff must show a real loss or injury proximately caused by the defendant's TILA violation. In order to show causation, the plaintiff must show that (1) he read the TILA disclosure statement; (2) he understood the charges being disclosed; (3) had the disclosure statement been accurate, he would have sought a lower price, and (4) he would have obtained a lower price.") (citations omitted).[16]

█ TILA also provides statutory damages for the violation of selected requirements, including the required disclosure of the APR. *See* 15 U.S.C. § 1640(a)(4) (indicating that statutory damages are available for violations of § 1638(a)(4) (the APR disclosure requirement)). Statutory damages are set at "twice the amount of any finance charge in connection with the transaction," bounded by a statutory minimum of $100 and a statutory maximum of $1,000. *See* 15 U.S.C. § 1640(a)(2)(A).[17]

Rucker has shown that Sheehy improperly calculated and disclosed the APR, in violation of § 1638(a)(4) and the implementing regulations, and therefore is entitled to statutory damages. The amount financed in the April 13 RISC was $6,672.91. Therefore, Rucker is entitled to the statutory maximum of $1,000.[18]

An appropriate Order has issued.

---

**16.** Although the APR was not properly calculated and disclosed, Rucker has not shown that the amount or timing of her payments itself violated TILA or was otherwise illegal. Therefore, there is no requirement that the dealer disgorge the extra interest it charged.

**17.** Rucker argues that the statutory damage cap does not apply to her case, and that she should be entitled to the full amount of twice the amount financed. A literal reading of TILA discloses that § 1640(a)(2)(A)(ii) and (iii) contain statutory maxima, but the provision applicable here, § 1640(a)(2)(A)(i), does not. *See* 15 U.S.C. § 1640(a)(2)(A). However,

based on the amendment history of the statute, courts have consistently and recently held that the cap applied in section (ii) also applies to section (i). *See Hodges,* 180 F.Supp.2d at 792 n. 6; *Strange v. Monogram Credit Card Bank of Georgia,* 129 F.3d 943, 947 (7th Cir. 1997); *Mars,* 713 F.2d at 67.

**18.** Rucker has also requested and shall be awarded reasonable attorneys' fees pursuant to 15 U.S.C. § 1640(a)(3). A schedule has been set for the submission of attorneys' fees. *See Rucker v. Sheehy,* Civil Action No. 02–466–A (E.D.Va. October 9, 2002) (Order).